# OSCAR HUGO WEBBER v. THE COMMONWEALTH.

ERROR TO THE COURT OF COMMON PLEAS NO. 4, OF PHILADELPHIA COUNTY.

Argued January 23, 1888—Decided March 19, 1888.

1. In criminal procedure, the rule of the common law, unaffected by §§ 66 and 67 of the Criminal Procedure act of March 31, 1860, P. L. 445, is: (*a*) the question of insanity at the time the offence was committed must be tried by the jury charged with the trial of the indictment; (*b*) if the question of insanity at the time of the trial is raised, it may be tried, in the discretion of the court, either by a special jury impaneled for that purpose, or by the jury who are to try the indictment.

2. It is only in cases of doubt as to the sanity of the prisoner at the time of the arraignment, that a preliminary inquiry by a special jury is to be ordered: wherefore, neither the assertion of the prisoner and his counsel, nor the production of affidavits, nor the entry of a plea of present insanity upon the record, can of themselves suffice to produce the state of doubt which is a necessary prerequisite to the ordering of the inquiry.

3. It follows, that the judicial mind may be informed by a personal inspection of the prisoner, an examination of him either public or private, inquiries from attending physicians and others about him, and other facts or testimony; but, if thereafter the trial judge have no doubt of the prisoner's sanity, he is neither bound, nor would he be justified in ordering the preliminary inquest.

4. Upon the trial of an indictment charging murder, a preliminary inquiry upon a suggestion of present insanity having been refused, the jury were expressly instructed to acquit if they found the prisoner insane at

the time of the offence, and if they found him guilty but that he was insane at the time of the trial, to add that fact to their verdict, and to give the prisoner the benefit of a doubt upon the question of his sanity. After a conviction the court refused a new trial, in his opinion concurring with the verdict upon the whole case: *Held*, on error, (*a*) that the refusal of the preliminary inquest was not an abuse of judicial discretion, and (*b*), that this court would not reverse, so that a preliminary inquest might still be had before the indictment could be tried again.

5. A witness having testified, on such trial, that, in a discussion just before the killing, the deceased rebuked the prisoner about some remark he had made to the witness at a visit some months before: *Held*, that it was not error to refuse the prisoner's inquiry, on cross-examination of the witness, as to what the remark was; because it was not part of the res gestæ and had not been the subject of examination in chief.

6. In such cause, the defence was insanity supervening in 1885; offers to prove directly the character and conduct of the prisoner, prior to that date, were refused, but the prisoner was permitted to prove character and conduct, after that date, showing a change from his former disposition indicative of mental disease: *Held*, that under the circumstances the refusal of the offers referred to was not error.

Before GORDON, C. J., PAXSON, STERRETT, GREEN and CLARK, JJ.; TRUNKEY and WILLIAMS, JJ., absent.

No. 115 January Term 1888, Sup. Ct.; court below, No. 210 December Term 1886, O. & T.

On December 20, 1886, a bill of indictment charging Oscar Hugo Webber with the murder of William H. Martin was found a true bill. On January 5, 1887, the prisoner was arraigned and not answering directly, the court, MITCHELL, J., ordered the clerk to enter a plea of not guilty, which was done. On February 7, 1887, present MITCHELL, J., a motion on behalf of the prisoner to withdraw the plea of not guilty was granted.

On October 17, 1887, the cause coming on for trial before ARNOLD, J., the counsel for the prisoner moved that a stay of proceedings be had until a petition be filed in the Court of Common Pleas under the act of June 13, 1836, P. L. 592, for the reason that the Court of Oyer and Terminer had no jurisdiction over insane persons. The motion was refused.[1]

Thereupon, counsel for the prisoner asked leave to file a special plea, in order that the issue might be framed to try the question of the present insanity of the prisoner. The objection of the commonwealth was sustained. The counsel then filed a

formal suggestion: "That Oscar Hugo Webber, held under the charge in the above bill of indictment made, and here before the court to answer the same, is a lunatic of non-sane mind and has not sufficient intelligence to comprehend the course of proceedings on the trial so as to make a proper defence or to conduct it with discretion, and that, before the court shall compel the prisoner to plead to said bill, a jury be lawfully impaneled to find whether such facts be true or not, so that the court may take action in the case as in the act of March 31, 1860, P. L. 445, is made and provided." The suggestion being objected to by the commonwealth, the prisoner's counsel offered to support their motion and inform the discretion of the court by producing affidavits, or witnesses viva voce, that the prisoner was then insane and therefore incompetent to plead or conduct his defence.

By the court: I consider that it is a matter within my discretion. Put the prisoner in the dock and arraign him.

By the counsel: But he has already been arraigned, and the record contains a plea of present insanity filed on his behalf and yet undisposed of.

The prisoner was thereupon put in the dock, and, upon being arraigned and the indictment read to him, was asked to say whether he was guilty or not guilty, and said: "I do not think it necessary for me to do so; I do not consider myself guilty of anything at all."

By the court: That is a plea of not guilty. [To the clerk:] You will enter the plea.

The counsel for the prisoner then renewed their suggestion that the prisoner was insane upon arraignment, and moved that that issue be first tried, and again offered to accompany the motion by affidavits, or witnesses viva voce, that the prisoner was incompetent to plead or conduct his defence. The motion was overruled.

Issue was then joined and a jury impaneled.

The commonwealth called the wife and daughter of the deceased and other witnesses, from whose testimony it was shown that in January, 1886, the prisoner had bought a small alarm clock at the jewelry shop of the deceased, with a guaranty that it would continue in good order for a year. In July,

Statement of Facts.

1886, he took the clock to the shop for adjustment. The deceased was not then at home, and in his conversation with Mrs. Martin something was said by the prisoner from which she felt aggrieved. On November 26, 1886, he again took his clock to the shop for repairs and on the afternoon of December 6, returned to get it. The clock was produced and tried over the counter, Mr. Martin being behind and the prisoner in front. Mrs. Martin was in the work-room, separated from the shop by a partition, and Grace Martin, a young daughter, was in the kitchen, separated from the work-room by an entry.

In the conversation about the clock some excitement arose, and Mr. Martin said to the prisoner, "If you had been a gentleman you would not have talked to Mrs. Martin as you did when you were here before." The prisoner got angry. Mr. Martin then ordered him from the store, and, passing from behind the counter, opened the door to put him out. As he turned towards him, the prisoner drew a revolver and rapidly fired four shots into Mr. Martin's body, one of which penetrated his heart.

Mrs. M. S. Martin, the wife of the deceased, being under cross-examination: Q. What happened at the prior visit of Webber, referred to by Mr. Martin on December 6, the day of the shooting, when he said, "If you had been a gentleman you wouldn't have talked to Mrs. Martin as you did when you were here before?" Objected to. Objection sustained.[20]

The case of the commonwealth being closed, the testimony in behalf of the prisoner was confined to the defence of insanity at the time of the homicide and the following witnesses were called and examined: Geo. Ph. Mueller, Dr. Julius Schrotz, Dr. Eugene Lamparter, Dr. W. H. H. Githens, Joseph C. Winterstein, R. F. S. Heath, Otto E. Webber, Fritz Shreyer, Mrs. A. Webber, Paul Webber, F. Blackburn, Charles Binder, Mrs. Valentine Rundnagle, Mrs. Maggie Parvin, Emil J. Mueller, E. J. Steinman, Mrs. Henrietta S. Webber, Dr. J. H. Lloyd, Dr. Charles K. Mills; all testifying upon the question of the prisoner's insanity at the time stated.

R. F. S. Heath, called for the prisoner, testified that he was in the firm of Mueller & Co., while the prisoner was there employed from 1878 to the time the witness left the firm, Janu-

ary 1885, and that he had seen him afterwards in 1886, when his conduct was changed: Q. What were the wages the prisoner got while in your employ? Objected to by the commonwealth; objection sustained.[21]

Otto E. Webber, the prisoner's brother, called: The counsel proposed to show, as part of the history of the mental disease alleged, that before the prisoner became insane he was an extremely affectionate, kind and faithful son and brother, and that it was through his efforts that the witness got employment when he first came to this country in 1878; this to be followed by evidence showing the change after 1885 in the prisoner's affections, character and temperament by reason of mental derangement.

By the court: You can show by your witness that there was a change; objection sustained.[22] [23]

The counsel then offered to show by the witness that his parents were supported by the prisoner from 1873 to 1881, as part of the history of the mental disease. Objected to. Objection sustained.[24]

Mrs. A. Webber, the prisoner's mother, called: The counsel made various offers to show, as part of the history of the mental disease of the prisoner, that the husband of the witness and father of the prisoner had been a merchant in Saxony, but had failed in business, and that since then the prisoner had been their chief means of support; where the parents went to live when they came to this country in 1881, and that the prisoner had been a kind and affectionate son to witness. These offers were objected to. Objections sustained.[25 to 28]

A like offer by Paul Webber, a brother called, was also objected to and objections sustained.[29]

Upon the rejection of these several offers to prove the character and conduct of the prisoner, prior to 1885, when it was claimed the insanity began, the defence was permitted to examine as to facts and their nature, after that date, indicating a change to a state of mental disease.

The case of the prisoner being closed, the commonwealth in rebuttal upon the question of insanity, called Thomas J. Powers, the deputy coroner; Magistrate William H. List, and Special Officer Murray, who saw and conversed with the prisoner on his

arrest immediately after the murder, and who testified as to his manner and conversation at that time, and to their several opinions that the prisoner was then sane.

The court, ARNOLD, J., then charged the jury, discussing the principles of the law of homicide, and of insanity as a defence, then proceeding:

What are the facts? It is alleged here that the prisoner went to get his clock; that after getting his clock a controversy took place between him and Martin, the deceased, about it, in which Martin said to him that if he had been a gentleman he would not have talked to Mrs. Martin as he did when he was there before. Upon that, Mrs. Martin says, Webber got very angry, and wanted to know what he had said, and then Martin said that the prisoner had said too much already. What does that indicate—a reasoning mind, or an unreasoning mind? Martin then told Webber to go away, to take his goods and go. Martin came around the counter, opened the door, and ordered Webber out. [Webber said "I will not go: I will show you what I will do," and as Mr. Martin turned from the door, he said, calmly, "You cannot frighten me that way." Webber then had his pistol out, and was pointing it at Mr. Martin.]³¹ He fired then, in as quick succession as he could fire, four shots.

You are entitled to consider the testimony of that witness, proving the acts done there that day, to determine whether they are the reasonable or unreasonable acts of a responsible or irresponsible man, and whether he knew what he was talking about, and knew what he was doing. Was he a reasonable being, was he of sound mind, was he conscious what he was doing, conscious of the difference between right and wrong, conscious and capable of forming a purpose and carrying out that purpose; or was he insane, unsound, diseased, so diseased in his mind that he could not form a purpose, and did he act under an insane impulse which was irresistible? Was what he did the act of a reasoning mind or of an unreasoning mind? It is for you to say. The daughter tells you she saw the same thing; that Webber would not go out; said he would show him, Martin, what he, Webber, would do, and that when the pistol was pointed her father said, "You cannot frighten me that way,"

and then she saw the shooting. When the prisoner was arrested his answer was, after he was asked why he did it, according to the testimony of some of the witnesses, that he did it in self-defence; to another witness he said: "We had a quarrel about a clock, or had some words. I went there for my clock and the man and I had some words; the man came from behind the counter and says, 'You go out.'" He said he looked at the man, and the man put his hand on his shoulder to put him out and then he shot him. I asked him if Martin hit him, and he said, "No."

In answer to the case presented by the commonwealth, the defendant, by his counsel, has alleged that he is insane, and irresponsible for this offence. Many witnesses have been called. Mueller, you will recollect, was the man who employed him. He testified to Webber neglecting his work; that he, Webber, told him, Mueller, of the suspicion that the prisoner had about his wife; that he told him that people were following him, going after him into restaurants to poison him; and then as to his going up to Mueller's house, staying there all night, getting up two or three times during the night and insisting that somebody was in the house after him; and, before eating, going out in the yard and putting his finger in his throat to make him vomit. These are some of the facts which the defendant's counsel introduced to prove to you that the man is of unsound and diseased mind in all respects.

Other witnesses detail very much the same thing. It appeared he suspected his brother of undue familiarity with his wife; he treated his wife badly, he left her; then changed his mind and came back; he then drove her out, tore up the clothes, children's clothing and bed clothing; kept her out of the house. All these were the acts introduced by the defendant's counsel to show the state of the man's mind.

Do they prove to you that at the time of the commission of this offence the prisoner at the bar, Oscar Hugo Webber, was unsound in mind, so diseased in mind as to be irresponsible for the offence which he committed on that day? It is a matter for you to determine, upon all the evidence, the non-expert as well as the expert evidence. You may also draw your own conclusion from what you have heard in the testimony, whether this man is responsible for the offence with

which he is charged.   If you think he was not responsible, if you think his mind was racked and overthrown by delusions of any kind, so that he is not to be held responsible for taking a human life, as he took it that day, you may say so and render your verdict of not guilty upon the ground of insanity. If, however, you think that he was a responsible being at that time; that he knew what he was doing, and understood the nature and consequences of his act, and might have refrained from doing it if he saw fit, then you may find him guilty in manner and form as he stands indicted.

As I stated to you before, the degree of the offence is a matter for you to determine.   The presumption is that murder is only murder of the second degree, and it is for the commonwealth to show you that it is of the first degree.   That may be proved by the circumstances of the killing.   If the circumstances of the killing indicate to you that the act was wilful, premeditated, deliberate, malicious and intentional, then they show a case of murder of the first degree.   Whether they have done so is for you to determine.   I shall express no opinion upon it.

You may go further: if you think he was responsible for his act at the time of committing it, and that he comprehended what he was doing, that he was responsible for a deliberate, wilful and malicious killing, but that he is at this time a lunatic, you may find him guilty of murder of the first degree, and add to your verdict that you find him now to be a lunatic.   You may do that, if you see fit.   Or you may find him guilty of murder of the first degree without more.   I leave it to you to say what your verdict shall be.   I do not intend to influence you one way or the other.   We have tried the case with a good bit of earnestness all around, to get the facts.   The evidence being in, I leave the facts and the law to you, trusting to your judgment that you will do what you have been sworn and affirmed to do, and, with patient deliberation, considering the whole case, the whole evidence, come to a righteous verdict.

There is one point I want to call your attention to: To convict a man of crime he must be convicted on evidence free from all doubt.   If there is any doubt about this case, of course that doubt should go to the benefit of the prisoner, both as to proving the offence charged against him and as to proving the

condition of his mind. If you are in doubt as to the state of his mind, he is entitled to the benefit of it. If you are not in doubt, if you are perfectly satisfied about the condition of his mind, then act upon that conviction; but if you are in doubt about it, give him the benefit of it. I will add, further, that the doubt which you are to consider is a substantial doubt, which springs out of the testimony alone. If, upon the testimony, you doubt, give the prisoner the benefit of it. Do not sit down and say there is a doubt, without more. You must consider the case, think over the testimony, and if, considering the whole testimony, your minds are in doubt, give the prisoner the benefit of that doubt.

The jury agreed upon a verdict finding the prisoner guilty of murder in the first degree, in manner and form as indicted.

On October 29, 1887, argument was had upon a motion in behalf of the prisoner for a new trial and in arrest of judgment, the grounds for which sufficiently appear in the opinion by ARNOLD, J., which, upon the question: "Has a defendant in a criminal prosecution upon suggestion that he is insane at the time of arraignment, the right to have a preliminary inquiry into his sanity, or is such inquiry a matter to be allowed or refused by the court within its sound judgment?" after considering the provisions of §§ 66 and 67, act of March 31, 1860; opinion of LUDLOW, P. J., in Commonwealth v. Taylor, 41 Leg. Int. 488, on error, in Taylor v. Commonwealth, 109 Pa. 262; 1 Whart. Cr. L., 7th ed., § 53, and Laros v. Commonwealth, 84 Pa. 200, proceeded:

In Taylor's case the jury had been sworn on a plea of not guilty, and the jury was instructed that they might pass upon the sanity of the prisoner at the time of the trial. In the present case the prisoner was about to be arraigned, when a suggestion was filed by counsel that the prisoner was insane at the time. An elaborate and learned argument was made by the counsel of the prisoner in his hearing. Nearly two hours were occupied in arguing and considering the motion, during which time I had the opportunity of observing the appearance and conduct of the prisoner, and the attention he gave to the proceedings. I had also the benefit of the information of the physician of the prison and others to assist me in coming to

Charge of Court below.

that sound judgment which it was my duty to exercise. Giving the matter the due consideration to which it was entitled, I came to the conclusion that the prisoner knew where he was, what he was here for, and what was being done.

Upon being arraigned, the indictment was read to him at length; and when he was asked to plead, he answered that he did not think it was necessary for him to do so, and that he did not consider himself guilty. These words are not the words of a madman or a lunatic. The prisoner did not think it necessary for him to plead. That shows that he could think, and that he expected to be tried on a collateral issue. He had previously withdrawn a plea of not guilty entered when he stood mute. As that was done in person, it shows that he knew enough to do it. He did not consider himself guilty; that is, he could consider and form an opinion. All that shows reasoning power and confirmed my judgment that he ought to be tried on the indictment. But in order to protect the prisoner from any evil consequences, in case my judgment should turn out to be erroneous, I told the jury, with emphasis, that if they thought that the prisoner is a lunatic at this time, they should add that finding to their verdict in case they should convict him; and I went further in favor of the prisoner, and told the jury that they might give him the benefit of any doubt on that subject, although the strict rule of law is otherwise: Coyle v. The Commonwealth, 100 Pa. 573, and cases cited. After a full and fair trial, he was convicted of murder of the first degree. I concur with the jury in that finding and see no reason to stay the sentence. . . . .

Judgment having been passed, the prisoner took this writ assigning as error in various forms:

1. The refusal of the motion for a stay of proceedings until a petition be filed in the Court of Common Pleas under the act of June 13, 1836, P. L. 592.[1]

2–19. The refusal to order, upon the suggestion filed, a preliminary issue and trial upon the question of the prisoner's insanity at the time of arraignment, with the order directing the plea of not guilty to be entered upon the reply of the prisoner upon arraignment.[2 to 19]

20–29. The refusal to admit the prisoner's offers.[20 to 29]

30. The submission of the case to the jury when the evidence showed that at the time of arraignment the prisoner was insane.

31. The part of the charge embraced in [ ] [31]

32. The overruling of the motion in arrest of judgment.

33. The passing of judgment upon the verdict.

*Mr. Sidney G. Fisher* (with him *Mr. Wm. Wilkins Carr*), for the plaintiff in error:

1. Section 67, of the Criminal Procedure act of March 31, 1860, P. L. 445, provides for proceedings to be had if any person indicted shall upon arraignment be found to be a lunatic "by a jury lawfully impaneled for the purpose;" but nowhere is jurisdiction given to a Court of Oyer and Terminer to lawfully empanel such a jury. At least there was concurrent jurisdiction in the Common Pleas under the act of June 13, 1836, P. L. 592. The defendant's life before mental derangement having been most exemplary, there was every reason why he was entitled to have his sanity determined in a jurisdiction freed from criminal associations and surroundings.

2. After a period of cruel criminal procedure, the statute 39 and 40 Geo. III., c. 94, was passed, the provisions of which subsequently appeared as §§ 58 and 59, act of June 13, 1836, P. L. 603, and were again copied as they now appear as §§ 66 and 67, act of March 30, 1860. Under the English statute preliminary trials were granted as a matter of right in Rex v. Pritchard, 7 C. & P. 303; Rex v. Dyson, Idem, 305; In re Whittaker, 4 Myl. & Cr. 441; Ley's Case, 1 Lew. C. C. 239; Regina v. Good, 7 A. & D. 536; Regina v. Whitfield, 2 C. & K. 121; Regina v. Israel, 2 Cox C. C. 263. American cases show that a preliminary hearing upon a suggestion of a defendant's insanity is allowed upon every principle of humanity and mercy: Freeman v. The People, 4 Den. 9; Guagando v. State, 41 Tex. 626; Taffe v. State, 23 Ark. 34; Commonwealth v. Brailey, 1 Mass. 103; United States v. Lancaster, 7 Biss. 440; Commonwealth v. Hathaway, 13 Mass. 299; Gruber v. State, 3 W. Va. 699; Schultz v. State, 13 Tex. 401; People v. Lake, 2 Park. C. C. 215; People v. Klein, 1 Eden. Sel. C. 13; People v. Ah Ying, 13 Cal. 18. The controlling reason is, that the conscience of the commonwealth shall be in-

formed, lest it bring additional suffering to an insane person.

3. The constitutional phrases, " due process of law," and " the law of the land," are synonymous, and the cases show that their meaning is, that such principles in the administration of the law as were in force under the common law of England when our constitutions were adopted, became part of the American law.   Therefore, as it was a common law rule that a prisoner who was insane could not be tried until sanity was restored or the fact decided by a jury, it became an inalienable right under these provisions of the Bill of Rights: Pomeroy, Const. Law, §§ 245, 250, 256; Cooley, Const. Lim., 351*; Berthoff v. Oreilly, 18 Amer. L. R., N. S., 119; People v. Essex, 70 N. Y. 229.

4. It was not " the law of the land " for the court to decide the question of fact raised by the plea or suggestion of present insanity.   That suggestion having been filed before arraignment, no discretion was left in the court but to try that question first.   Because the defendant had an inalienable right not to be tried if he were insane, that right could not be taken away, either by the court or the legislature, nor could it be waived by the prisoner or by his counsel.   Prine v. Commonwealth, 18 Pa. 104; Dougherty v. Commonwealth, 69 Pa. 291; Taylor v. Commonwealth, 109 Pa. 270, and 1 Whart. Cr. Law, § 53, cited by the court below, contain no authority for the ruling, for in the case at bar the suggestion was filed before arraignment, and before the prisoner had been in jeopardy. In Laros v. Commonwealth, 84 Pa. 200, the suggestion was filed after conviction.

5. But assuming that there was judicial discretion to refuse to impanel a jury to decide the question raised by the suggestion, we submit that to put an insane man upon trial for his life is an abuse of judicial discretion, and reviewable: Ingles's Est., 76 Pa. 430; Chew v. Chew, 28 Pa. 17; Catlin v. Robinson, 2 W. 373.   And the refusal to permit judicial discretion to be informed by the production of affidavits, or witnesses viva voce, in open court on behalf of the prisoner, was also a violation of the rules of procedure which was reviewable.

6. As to the twentieth and thirty-first assignments.   The question addressed to Mrs. Martin as to what happened on the prior visit, was admissible, because the fact was part of the res

Arguments.

gestæ. A party may cross-examine as to the res gestæ given in evidence though it be new matter: Markley v. Swartzlander, 8 W. & S. 172; Covanhovan v. Hart, 21 Pa. 495. In homicide cases, any one of a series of acts leading up to and explaining the killing is part of the res gestæ: Commonwealth v. Eaton, 8 Phila. 428; McCue. v. Commonwealth, 78 Pa. 185. Declarations showing the relations of the parties are evidence as part of the res gestæ: Postens v. Postens, 3 W. & S. 127; Koch v. Howell, 6 W. & S. 350; Kimmel v. McRight, 2 Pa. 38; Ellis v. Guggenheim, 20 Pa. 287.

7. It is plain that the testimony as to Webber's earlier life, before becoming insane, was admissible: Giteau's Case, in Lawson on Insanity, 169.

*Mr. George S. Graham, District Attorney,* for the defendant in error:

The multitude of specifications of error can be resolved into one inquiry: Is a preliminary issue to try the question of the competency of the prisoner to plead or defend, a matter of right and a subject of exception, or not?

1. The act of May 19, 1874, P. L. 219, providing for exceptions in cases of felonious homicide, etc., provides only for exceptions taken on the trial of the indictment. New York has a similar statute, and it was held that it did not authorize exceptions to be taken in such preliminary trial as was demanded here: Freeman v. The People, 4 Den. 9. As the trial of the preliminary question of insanity is not covered by our statute, the granting or refusal of such an issue is not the subject of exception or review. At all events, the statute does not authorize a review of matters which had theretofore rested solely in the discretion of the court below: Alexander v. Commonwealth, 105 Pa. 1.

2. The granting or refusal of the preliminary issue was a matter of judicial discretion. All the authorities agree that the condition to such an inquiry is, "if the prisoner appear to be insane." Who shall judge of this appearance? It can only be the court. In whose mind is the doubt to exist? Clearly in the judicial mind. The common law rule as stated by 1 Whart. Cr. Law, 8th ed., 88, recites several methods by which the question of present insanity is to be disposed of:

(a) By the jury charged with the trial of the indictment. (b) By pleadings ore tenus and an inquest in the nature of an inquest of office. But these methods are to be resorted to only in case the judge is in doubt. And where the two methods are provided, the exercise of a discretion is implied.

3. Not one of the English cases cited holds the trial by a jury of the collateral issue as to insanity to be a matter of right. And among the American authorities, there is but one that speaks of it as a matter of right, and that authority is a Texas decision. There is no ruling in this state directly on the question, but Freeman v. The People, 4 Den. 9, is a help and a guide, and Jones v. The State, 13 Ala. 157, is in point. How the discretion of the court is to be exercised is not defined by law; but in Freeman v. The People, 4 Den. 9, before the case was called for trial the second time, the trial judge went to the prison and in a private interview with the prisoner satisfied his mind as to his mental condition.

OPINION, MR. JUSTICE GREEN:

The question principally discussed in this case is a novel one. It does not appear to have ever been determined or even presented in this court before. Briefly stated it is this: whether a defendant in a criminal case who alleges his insanity at the time of arraignment is entitled, as a matter of legal right, to have a separate, independent and preliminary trial of that question by a jury specially impaneled for the purpose.

It is certainly the fact that the 66th and 67th sections of our criminal code of 1860 are substantially, almost literally, taken from the English statute of 39 and 40 Geo. III., c. 94, and that under that statute the English criminal courts do, not infrequently, award preliminary issues to determine the sanity of prisoners by the verdict of a jury. The same is true of the practice in several of our sister states. We have examined with much care the various authorities cited in the very able and exhaustive argument of the learned counsel for the plaintiff in error, and we find that in all of them the inquest was directed, generally by the court of its own motion, sometimes at the instance of the attorney general, but always in cases where the appearance and actions of the prisoner were such as to manifestly indicate a condition of insanity, either real or

simulated. In point of fact the purpose of the inquiry was to inform the conscience of the court as to the prisoner's real condition at the time of the trial, but before the trial proceeded. There was an obvious propriety in directing an inquiry by the verdict of a jury in all such cases, because the fact itself required determination before any further proceedings were had, if there was probable ground for belief that a condition of insanity existed. If upon an examination of the prisoner there was no apparent reason to suppose him insane, but on the contrary he seemed quite capable of pleading to the indictment, there was no necessity for a preliminary trial; because every right to set up insanity, either when the offence is committed, or at the time of the trial, still remained, and could be thoroughly tried by the jury who were to try the indictment. The existence of the doubt as to the prisoner's present insanity, is a matter which by the very necessity of the case could only be determined by the court itself. Up to the time of pleading there is no other tribunal which has the prisoner in charge, and there is no other which can say whether there is a doubt upon that subject. It is one of the functions which must be intrusted to the court, and it is not to be presumed that it will in any case be abused. If it should be, there is still the remedy available in all cases where abuse of discretion has taken place.

In the cases in which this subject has received consideration, the doctrine has been expressed in accordance with these views. In Whart. Crim. Law, 8th edition, vol. 1, § 58, it is thus said: " By the common law if it be doubtful whether a criminal who, at his trial, in appearance is a lunatic, be such in truth or not, the issue shall be tried by the jury who are charged to try the indictment; or, being a collateral issue, the fact may be pleaded and replied to ore tenus and a venire awarded, returnable instanter, in the nature of an inquest of office. If it be found by the jury that the party only feigns himself a lunatic and he still refuse to answer, he was, before the act of Geo. IV., c. 28, § 2, dealt with as one who stood mute and as if he had confessed the indictment. The principal point to be considered by the jury would be whether the defendant has a sufficient intellect to comprehend the course of the proceedings on the trial so as to be able to make a proper defence. Whether the prisoner was sane or insane at the time the act was committed, is a question

of fact triable by the jury and depending upon the previous and contemporaneous acts of the party." That is to say, the defence of insanity at the time the crime was committed must be tried by the jury charged with the' trial of the indictment, and if the question of sanity at the time of the trial is raised, it may be tried either by a special jury impaneled for that purpose or by the jury who are to try the indictment. This is the undoubted meaning of the text and it expresses the rule as it was at the common law, and also as it was changed by the act of Geo. IV.

In the case of Freeman v. The People, 4 Den. 9, cited for the plaintiff in error, the question arose upon a section of the Code which provides, "No insane person can be tried, sentenced to any punishment, or punished for any crime while he continues in that state." The court said, "The statute is explicit that no insane person can be tried, but it does not state in what manner the fact of insanity shall be ascertained. That is left as at common law and, although in the discretion of the court, other modes than that of trial by jury may be resorted to, still in important cases that is regarded as the most discreet and proper course to be adopted." In the case of Jones v. The State, 13 Ala. 157, the court said: "But in the case before us the judge did not see proper to test the prisoner's sanity by a preliminary inquiry to ascertain whether he was capable of pleading to the indictment or not; he did plead and a trial and conviction was the result, although we are of opinion that the facts disclosed in the bill of exceptions might well have warranted the preliminary inquiry as to the prisoner's mental condition, yet this must be left to the sound discretion of the court below."

In State v. Arnold, 12 Ia. 483, the court said: "The court is to inquire into the prisoner's mental condition at the time he appears for arraignment. In determining whether a reasonable doubt exists as to his sanity before impaneling a jury, the judge is not confined alone to the case made by the counsel . . . . . but may in his discretion investigate the whole matter and determine whether the necessity exists for the inquiry. But the inquiry should not be allowed, if from all the circumstances he has no reason to doubt his sanity." The foregoing was said in construing a statute of the state of Iowa, which

provided that there should be no trial if there was a doubt whether or not the prisoner be insane. In Hawkins' Pleas of the Crown, p. 3, the writer says: "And by the common law if it be doubtful whether a criminal who at his trial is in appearance a lunatic, be such in truth or not, it shall be tried by an inquest of office, to be returned by the sheriff of the county wherein the court sits."

The foregoing are the only text books and reports of cases which we have met with, in which the subject we are considering has been discussed or decided, and they all concur substantially in the proposition that it is only in cases of doubt as to the sanity of the prisoner upon arraignment, that a preliminary inquiry is to be ordered. This being so, it is manifest that neither the assertion of the prisoner or his counsel, nor the production of affidavits, nor the entering of a plea of present insanity upon the record, can of themselves alone suffice to produce the state of doubt which is a necessary prerequisite to the ordering of the inquiry. They are all necessarily addressed to the court, as there is no other tribunal to entertain them; and it is the court, after all, which must be affected by the various considerations which are supposed to, or in fact do, produce the doubt which must precede any order for an inquiry.

It follows of course, that other considerations than those stated may affect the judicial mind and induce the existence of a doubt. A personal inspection of the prisoner, an examination of him whether public or private, inquiry from an attending physician or from those around the prisoner who have means of knowledge, all of these, and, doubtless, other facts or testimony, may contribute to the creation of doubt in the mind of the judge and for that reason all may be resorted to; but, if after all have transpired, the judge has no doubt of the prisoner's sanity, he is neither bound, nor would he be justified in ordering an inquest. It is the judicial conscience alone which can determine this question, and it is that conscience only which must be informed so that it may act intelligently.

These views dispose of the question.

The absolute right of the prisoner to have the question of his sanity tried by a jury is not at all affected. Nor was it in any manner denied to the prisoner in this case. The question

of his sanity both at the commission of the offence and at the time of the trial was fairly and fully submitted to the jury who tried the indictment. After hearing all the testimony, they found against him, and a careful reading of the testimony fails to convince us that the finding was wrong.

There is nothing in the 66th and 67th sections of our criminal code of 1860 which requires a different conclusion from the one we have reached. The 66th section directs, that if upon the trial the prisoner shall be acquitted by the jury upon the ground that he was insane at the time of the commission of the offence, they shall so declare specially, and thereupon the court shall order him to be kept in strict custody so long as he shall continue of unsound mind. The 67th section merely provides that if upon arraignment he shall be found to be a lunatic by a jury lawfully impaneled for the purpose, the same proceedings shall be had. Certainly this ought to be so, for if the fact of insanity be found by a jury whether before the trial or on the trial, the same power to hold him in custody during the continuance of the insanity ought to be exercised. The court cannot find the prisoner to be insane, for that is matter of fact to be found by a jury. But if the court has, upon arraignment, reason to think him insane, or even has doubt upon that subject, they may order an inquest for the purpose of trying that question; and then, if the inquest should find him insane, the order for custody may be made, and this is the whole meaning of the act. There is nothing in its letter or spirit which makes it obligatory upon the court to order a preliminary inquest.

In view of the evidence offered and admitted on the trial in support of the allegation of insanity, we think the learned court below could with entire propriety have heard the testimony offered when the application for a preliminary inquiry was made. And if, after hearing it, the judge had entertained doubt as to the present sanity of the prisoner, it would have been his duty to award an inquest for the trial of that fact before any further proceedings were had. This was not done, but the jury has now found that the prisoner was not insane, either at the time of the trial or at the commission of the offence. The verdict was reached after a patient hearing of all the testimony relied upon by the prisoner, and after a fair and

perfectly impartial charge by the judge who said nothing tending to bias, or even to lead the mind of the jury against the prisoner. After the verdict, upon a motion for a new trial, the learned judge expressed his satisfaction with the result and refused the motion. Both his own opinion, after hearing all the testimony, and the verdict of the jury concur in the conclusion that the prisoner was not insane either when the offence was committed or at the time of the trial. In consideration of this state of the record, we do not see how we could with any propriety say that the learned judge abused his discretion in refusing the preliminary inquest. His action has been justified both by the verdict and his own freedom from doubt after hearing all the testimony. It would be indecorous and without warrant for us to say, now, that the judgment should be reversed in order that a preliminary inquest should still be had before the indictment can be again tried. Whether the prisoner was insane when he was arraigned before, is no longer a practical question and could not be tried if a reversal was granted; and it would be impossible for us now to reverse in order merely that the prisoner may be again arraigned, may plead his insanity at such arraignment and have a special inquest to try that plea. He has already been tried upon that issue and it has been found against him. We would be compelled to set aside this finding as unwarranted by the testimony, in order to give the prisoner any practical relief upon his own theory; but upon our views of the testimony, we have neither the right nor the inclination to take such a step. These views dispose of the first nineteen and the 30th, 32d and 33d assignments of error.

The 20th assignment is without merit. What happened at the previous visit of the prisoner to Martin's store was no part of the res gestæ occurring at the shooting, and there was nothing in the examination in chief of Mrs. Martin which would make it a subject of cross-examination.

The language of the court covered by the 31st assignment is fully sustained by the testimony of Mrs. Martin who testified that her husband said to the prisoner, " Oh! you can't frighten me that way. The pistol was then held to him. Webber fired then, in as quick succession as he could fire."

The rejected question covered by the 21st assignment was

clearly irrelevant.    It was an inquiry as to the amount of wages received by the prisoner while employed by Mueller & Co., from 1878 to 1885.

The evidence offered and rejected under the remaining assignments related to the earlier history of the prisoner, and was directed mainly to the inquiry whether he had been of a kind and affectionate disposition.   A time was stated, about 1885, when a change was noticed in his temper and in his actions.   All the witnesses were allowed the fullest latitude in describing this change, and in doing so his former disposition was described.   His mother testified that "he was always good to us and sent us several times money in Germany."   His brother testified, "He was always a good friend to me and we never fought together."   His wife testified, "His treatment was right good up to 1885," and then described the change which took place in him in that year and continued afterwards. She also said, "His manner was very different than before 1885.   He was always very affectionate.   He always thought no one was like his family, particularly his little girl."

Some of the offers of testimony were rejected and not fully supplied by testimony afterwards; as, for instance, that he was the principal means of support of his parents from 1873 to 1881.   We cannot see the relevancy of this offer, nor how its exclusion harmed the prisoner, when it was subsequently proved that he sent money to his parents in Germany several times, and that when they came to America they lived with him.   The offer to show that the prisoner's father had been a merchant in Germany and failed, was certainly irrelevant, and so also the offer to prove that the prisoner had been the means of his brother Paul obtaining employment in 1881.   Everything else covered by these assignments was in fact given in evidence, as was also everything that was offered as to his mental condition from the time the change was noticed in 1885 until the offence was committed.

We do not see any errors in this record which would warrant a reversal of the judgment.

> The judgment of the Court of Oyer and Terminer of Philadelphia county is affirmed and it is ordered that the record be remitted to said court for the purpose of carrying the sentence into execution.

Mr. Justice STERRETT, dissenting:

Being in accord with the majority of my brethren, except as to certain specifications of error which, in my humble opinion, imperatively demand a reversal of the judgment, I propose to address myself, as briefly as possible, to the general question involved in those specifications, viz.: Did the learned judge of the Oyer and Terminer err in either of his rulings relating to the application of prisoner's counsel for a preliminary inquiry, such as is contemplated by the first clause of the 67th section of our criminal procedure act, to determine, "by a jury lawfully impaneled for the purpose," whether the prisoner was, at the time of his arraignment a lunatic or not?

If it were not for what I conceive to be manifest error in the rulings of the learned judge in that regard, especially his refusal to even hear any evidence in support of the application, I would be in favor of affirming the judgment; but, with these radical errors patent upon the face of the record, resulting as I believe, in an improper conviction of the prisoner who, according to the weight of the evidence, was insane when he was compelled to plead to the indictment, and probably in the same condition of mind when he committed the homicide, I am constrained to dissent and put on record my reasons for so doing.

I have no sympathy whatever with the pettifogging and groundless defences of insanity that are too often interposed to shield the guilty from merited punishment; but the case at bar is not one of that class, as the evidence which the learned counsel by their diligence, unaided by the prisoner, were able to adduce on the trial, will show. That evidence tends to prove that, before the marked change in his mental condition occurred and he became the victim of delusions, he was peaceable, industrious and thrifty; a kind and affectionate son, husband and father, exemplary in all the relations of life. But let the testimony of a few witnesses speak for itself.

George P. Mueller: "I knew the prisoner. Got acquainted with him in 1877. He was not then in my employ. I engaged him in 1878. He was recommended to me as an industrious man; engaged him as engineer and machinist. He was a good workman, the kind of man I was looking for, and was steady in his work. In the fall of 1885, I noticed disturb-

ances. He complained of not feeling well; had to consult a physician and got medicine. In October, 1885, he asked to be let off for a few days for recreation and I let him off. Then I said, 'Oscar, I let you off for a few days.' On Monday morning he did not come, but came in the afternoon, and said nothing, but laughed and said he wanted to say something private to me, and I took him into my room, and he spoke about his wife being untrue to him, having men in the house, that they jumped the fence and he had seen them. I said, 'Oscar, aint you mistaken?' He said, no, I saw them and that proves it. I talked to him for an hour and tried to get the idea out of his head, but he said 'no.' He went away and came the following day, and staid in my place till towards evening. I said to him, go and see the doctor. I noticed his expression and whole conversation were like that of a man who was suspicious. I told him to go see Dr. Schrotz; see what he says, etc. I told him, 'Oscar, go round 6th street where I get my dinners and get a good supper.' . . . . . I went home at 7 o'clock, took supper and all at once heard my name called. . . . . . I saw it was Oscar Webber. I said, 'Oscar, what's the matter?' He said, 'Mr. Mueller, I had to do it. While I was at supper three men followed me, and when I ate supper they looked at me.' He said he did not eat supper in the restaurant, as he did not want to be poisoned. He said, 'I left there and the men followed me, while I was going to Dr. Schrotz.' He said he was afraid the men would catch him. He said he went over different streets to escape them, until he got to Sixth and Berks streets. I took him in. My wife and sister-in-law pitied him. His condition was like, I don't know what. I said, 'Oscar, sit down and eat some supper.' My wife said to me, 'go down and see Dr. Schrotz.' Dr. Schrotz came up at 9 o'clock, called Webber into the parlor, and he talked to him. I don't know what he said. I got a prescription made for him. Dr. Schrotz went away. We took Webber to bed, and thought all was right. After midnight some one came down and knocked at our door. I got up, opened the door, and Oscar was there. I said, 'why, Oscar, what do you want?' He said, 'some one got in the window, and it was the men who followed me.' I said to him, he was wrong, there was no one there I'm sure. I went down

stairs, lit the gas, searched the whole house, and found no one. I said, ' Now, you're satisfied.' At four he came down again. He said, ' let me in your room; These men are after me, and I can't rest.' I told him no one was in the house, and made him go up again. At six o'clock he came down again, and said the same thing. He staid until breakfast, and went down town with me. I told him to follow the doctor's advice. He came round the whole week and complained. I couldn't persuade him to change his mind as to his wife. He didn't work the whole week. The next week I didn't know whether to engage him or not, on account of his acting. Still, I had pity on the man, and got a man to see if he tended to business right. Nothing occurred then until about December. One morning, while tending to machine he said, could you make me a partner. He had given me $1,500 or $1,600 to keep, and on that he wanted to be a partner. I told him I had a partner, and I wanted to consider; it was worth while to consider and I couldn't give him an answer at once. He left on January 6, 1886. Saw him next when he came in now and then, and I returned him his $1,600. I next saw him in January, 1887, after his arrest, at Moyamensing prison. When I went there he would have nothing to do with me. At Moyamensing prison I went in and shook hands, and said, how goes it. He said, pretty well. I could get no answer to the different questions as to why he was arrested. I went again in February; he was the same way again. I asked him a great many questions about the occurrence, but he would not say anything. Took him oranges, and he refused them. He said, don't want anything. He said he didn't want to see his wife, or his mother; didn't want to see anybody. Then I spoke to him about lawyers. I said, the court has appointed them. He said, well, I don't need a lawyer. The district attorney has to take my part. I said, you are wrong. He can't take your case. He said, it is all right. I went down again just before the case was fixed for trial last June, and he refused to see me. I went down again last Friday. I went up and talked to him for a half hour about his case, and the jury. He was as before, would not talk to me. He did not seem to understand. He said he'd tell all when he got on the stand. I could not make him understand about the trial. I knew

him at home. I saw him there once in a while. . . . . He was a good husband before the occurrence, and a faithful son, and good brother."

Dr. Julius Schrotz: " I have practiced medicine 31 years. My office is 808 North Eighth street. That is the man referred to by Mr. Mueller (pointing to prisoner). I knew the prisoner. Never knew him before that night when I was called. I got there at 8 o'clock. Was in the parlor with Webber. He was very much excited, and said he feared persecution by men who followed him all the time. I tried to have him go home, but he wouldn't do it. I gave a prescription for him ; told Mrs. Mueller he might be noisy at night. Two months afterward he came in again, and asked for a certificate of sound mind. I referred him to his family physician. At that time he was out of his mind, suffering from hallucinations. When I saw him he undoubtedly was not in his right mind."

Dr. Eugene Lamparter: " Have been practicing since 1866. I know the prisoner for 9 or 10 years. He used to come to me to consult me for himself and family. . . . . I remember meeting the prisoner on 13th street during 1866, about August. He was disturbed and excited. I asked him where he was going. He said his brother was in his house with his wife; he had caught him. He told me if he found him again he would try and shoot him. I told him I did not believe him. He had but one brother at home. I tried to persuade him not to believe such a thing. He said he would have shot him then, but his brother got out of the key-hole. He said his brother was a gifted boy and could get in or out of cracks.

R. F. S. Heath: "I was a manufacturer of straw goods, and formerly in the firm of Mueller & Co. I knew the prisoner. He came to us in 1878 and remained as long as I was a member of the firm, which was up to January, 1885. I always found him gentlemanly, and quiet, and industrious, and we never had any difficulty with him. He came to my store afterwards, in 1886 ; he talked strangely about a physician, and his own family ; that they conspired to get him away, and he left with me three or four kinds of medicine. He said they were poison, and I destroyed them. He had a vacant look and talked strangely. He frightened my daughter. I say he

was insane from October, 1885, till placed in prison last December. He mentioned the fact of his being pursued by strangers to kill him, and that his family had conspired against him."

Mrs. Parvin: " Know the prisoner. Lived next to him for three years up to 1886. He lived in a three story brick house. For the three years that I saw him he was a quiet man, devoted to his family. Question: Did you notice any change in him? Answer: All at once he became very noisy. He would come home making excitement all the time. This was in the latter part of 1885. He accused his wife of doing things I don't think she had done. He came out of the house with a wild look, as if some one was following him. His wife came and told me what he said of her. One Sunday I sent my daughter up for his wife's father, I thought he would kill her. He came up Thirteenth street on a street-car, and jumped in the parlor window, without trying to open the door. It was in the middle of the day."

J. H. Lloyd, M. D.: " Live at 40th and Walnut streets; have been practicing for ten years; am connected with the nervous department of the University Hospital. . . . . I have heard testimony in this case. I make up my opinion from the observation and history of the case. I have examined prisoner five times. Question: Assuming the facts to be true that were presented by defendant, what is your opinion of his mental condition? Answer: I believe him to be insane. I base my opinion, first, on his change of character and habits; second, the formation by him of delusions of persecutions; these delusions were that his food was being poisoned, that his wife was unfaithful, that his fellow workmen were false to him, the instance of his being followed by night. Those are some of the main persecutions and delusions testified to which I now recall. I remember also he suspected the use of chloroform, and he believed that his wife could transform men into lower animals. I remember also the delusion as to putting of poison in his food. I cannot give the exact date of the four examinations of prisoner I have made. I have not my note books here. The last time I examined him was on Wednesday. In examining him I can state in general terms that I received evasive answers. There were few direct answers to

my questions. He seemed suspicious that I was not his friend; all his remarks were in a rambling and indirect way, saying he would see about it, that it was all right, etc. He said if I came from his lawyer I ought to understand all about it. On last Wednesday, Dr. Mills, Dr. Butcher, the prison physician, Mr. Carr, one of his counsel, and a gentleman whom I do not know, were present. Mr. Carr told him about the day for the trial being fixed, and asked him to tell us something about the affair, that we might get his defence ready. He only said that it was all right. His counsel also showed him a printed list of names, and said that they would be the jury who would try him, and wanted to know if Webber knew any of them. He did not appear to understand, he would not say anything about the jury list. He gave a deaf ear to anything that was said and appeared not to realize the gravity of his position. I have come to the conclusion that he is insane, both from the examination and the testimony."

Dr. Charles K. Mills: "Office 1909 Chestnut street; have been practicing since .1869; practice in Episcopal Hospital, University Hospital and the Norristown Hospital for Insane; have given special attention to nervous and mental diseases; have a very large experience with nervous diseases and the insane; see such cases every day in hospitals and private cases. During the testimony here I have been present a large part of the time. Once I went out of court to send a telegram, and one morning I was a few minutes late in getting to court. I have made examinations of the prisoner in Moyamensing prison four or five times. I examined him in January, February, May and June, and a few days ago, last week on Wednesday. . . . . It was impossible to get a direct, explicit reply to any question; he would make but few direct answers. His manner and tone were very peculiar. . . . . His answers were not sensible, he would occasionally utter a sentiment that would be sensible. . . . . He impressed me as a man who was suspicious, restless, and whose mind was unhinged. My opinion is that this man is a very insane man, from the evidence and as a result of these examinations. In forming my opinion upon the evidence, I considered his suspicions of chloroform being given him, and of unfaithfulness of his wife. The scene about the revolver, that he broke a hole in door by which latch

was lifted, the change in his manner of acting towards his rela-
tives, what he said happened in the restaurant, and of powder
being put in his food to poison him, that the same parties fol-
lowed him to Mr. Mueller's house. Then, again, the change
in his habits and disposition. They were different from what
they ought to have been if he were sane. Then, as to having
given up work; he had saved sixteen hundred dollars and then
ceased to work; he gave up his habit of saving. He had been
affectionate to his wife and then had ceased, and had begun to
suspect her without cause. Also the change of habit in treat-
ing his parents. They testified he had given money to his
parents in the old country; his brother testified to his kind-
ness, and that he believed in him, and then had ceased to
believe. I have carefully thought over it, and I have made up
my mind and believe this man to be insane."

On cross-examination Dr. Mills said: "In the facts I have
heard testified to of the shooting of Mr. Martin, it might have
been either the result of Webber's delusion or of revenge. It
might be either. If his mind was obscured by its general
delusional condition, relative to suspicion, I do not think it
would be revenge, but would be the act of an insane man.
The explanation I have heard here of putting Webber out of
the store would not clear it of the delusion. . . . . In my
judgment this man was not simulating. I believe this man is
a case of delusional insanity. He suffers from delusions of
suspicions, persecutions, etc. I believe there is a general delu-
sional condition. He believes he was poisoned, was chloro-
formed and followed; that his wife was unfaithful, etc."

It was conclusively shown that the suspicions, etc., of the
prisoner, referred to by the witnesses, were wholly groundless.

This is the general character of the evidence with which
prisoner's counsel were prepared to support their application
for a preliminary inquiry as to his insanity at the time he was
arraigned, and the kind of evidence the learned judge resolute-
ly refused even to hear, either in the form of affidavits or
by examination of the witnesses in open court. If that was
an exercise of sound judicial discretion, it would be difficult
indeed to say what, in a legal sense, constitutes abuse of dis-
cretion.

The 66th section of the act referred to, provides for cases in

which the jury by their verdict finds specially that the prisoner was insane when he committed the crime charged in the indictment and is acquitted by them on the ground of such insanity, and empowers the court to order him to be kept in close custody so long as he shall continue to be of unsound mind.

The first clause of the next section, under which the application in question was made, provides : " The same proceedings may be had, if any person indicted for an offence shall upon arraignment be found to be a lunatic by a jury lawfully impaneled for the purpose." The last clause of the same section provides for the case of a prisoner who has gone to trial without such preliminary inquiry as is contemplated by the first clause. " If the jury find by their verdict that he is then insane, the court shall direct such finding to be recorded and order him to be kept in close custody," etc.

These provisions, substantially copied from the English act, 39 and 40 Geo. III., c. 94, were first enacted by our legislature in 1836 and afterwards embodied in our criminal code of 1860. It is conceded the.English courts frequently award preliminary issues to determine, by the verdict of a jury, the sanity of prisoners when arraigned on indictment, and the same practice prevails in several of our sister states whose legislation on the subject is similar to our own.

Our learned brother, who speaks for the majority, after reviewing the authorities on the subject, comes to the conclusion " that they all concur in the proposition that it is only in cases of doubt as to the sanity of the prisoner upon arraignment, that a preliminary inquiry is to be ordered. This being so, it is manifest that neither the assertion of the prisoner or his counsel, nor the production of affidavits, nor the entering of a plea of present insanity upon the record, can of themselves alone suffice to produce the state of doubt which is the necessary prerequisite to the ordering of the inquiry. They are all necessarily addressed to the court, as there is no other tribunal to entertain them ; and it is the court, after all, that must be affected by the various considerations which are supposed to, or in fact do, produce the doubt which must precede any order for an inquiry. . . . . It is the judicial conscience alone which can determine this question and it is that conscience only which must be informed so that it may act intelligently." He

therefore concludes that it rests in the sound discretion of the trial judge whether in any given case a preliminary issue shall be awarded to determine the then sanity of the prisoner.

This construction of the act is quite as favorable as the commonwealth can possibly ask, and I agree with the majority in saying it is the proper construction; but, in the practical application of the law, as thus construed, to the undisputed and indisputable facts of this case, we reach entirely opposite conclusions as to the legality of the court's action in this case.

Granting that it is discretionary with the trial judge to award or refuse the preliminary inquiry contemplated by the first clause of the 67th section, above quoted, it must of course be understood to mean a sound legal discretion, not an arbitrary or unreasonable exercise of judicial power; nor can it be the preconceived opinion, however strong, of a judge who refuses to hear evidence tending to show that the application is meritorious and not frivolous. If it is the "judicial conscience alone" that must be enlightened so that it can act intelligently, it would seem to follow that affidavits and oral testimony of witnesses in open court, calculated to shed light on the subject, should not be waived aside as unworthy even of being heard. That is substantially what was done in this case, as abundantly appears by the bill of exceptions.

The prisoner being without counsel, the court, sometime before the case was called for trial, appointed two reputable gentlemen of the bar to represent him, and they are entitled to great credit for the marked ability and energy with which they have performed their duty. Having obtained such information as was within their reach, as to the mental condition of the prisoner, etc., when the case was called for trial on October 17, 1887, they moved a stay of proceedings for the purpose of having the question of the prisoner's insanity determined in the Common Pleas. That being denied, they then asked leave to file a special plea, setting forth his then insanity in order that an issue might be formed to determine that question. That also being refused, they then signed and presented to the court a suggestion setting forth that the prisoner then in court "is a lunatic of non-sane mind, and has not sufficient intelligence to comprehend the course of proceedings on the trial so as to make a proper defence, nor conduct it with discretion, and

before the court should compel him to plead to the bill of indictment a jury be lawfully impaneled to find whether such facts be true or not, so that the court may take action in the case, as in the act of March 31, 1860, is provided." In connection therewith they offered to support their motion and "inform the discretion of the court, by producing affidavits or witnesses viva voce that the prisoner is now insane and therefore incompetent to plead or conduct his defence." That was also refused, the learned judge saying: "I consider that it is a matter in my discretion." Thereupon, the prisoner was arraigned and in answer to the question "whether he was guilty or not guilty," said: "I do not think it necessary for me to do so; I do not consider myself guilty of anything at all." The learned judge pronounced his answer a plea of not guilty and by his direction it was so entered of record. Counsel for the prisoner then renewed their suggestion that he "is insane upon arraignment," moved that that issue be first tried, and again offered "to accompany their motion with affidavits or witnesses viva voce that the prisoner is incompetent to plead or conduct his defence." The motion being denied, a jury was impaneled and the trial proceeded. The foregoing and other rulings of the court were duly excepted to and form the first nineteen specifications of error.

That the application for a preliminary inquiry as to the insanity of the prisoner was prompted by a sense of duty to the unfortunate prisoner and made in perfect good faith, cannot be doubted. The evidence which the learned counsel were able to adduce on the trial is convincing proof that they were prepared to sustain their application by affidavits or witnesses viva voce; and if the court had not persistently turned a deaf ear to both, facts would have been presented, which, in the exercise of a sound judicial discretion, would not only have justified but demanded a preliminary inquiry as to the then mental condition of the prisoner.

The learned judge having refused to hear the evidence offered by prisoner's counsel, in what way, it may be asked, was the "judicial conscience" enlightened, and upon what did he base his judgment in refusing the application? The only answer that can be given is what he himself says in his opinion overruling motion in arrest of judgment and for new trial, viz.:

"the prisoner was about to be arraigned when a suggestion was filed by counsel that the prisoner was insane at the time. An elaborate and learned argument was made by the counsel of the prisoner in his hearing. Nearly two hours were occupied in arguing and considering the motion, during which time I had the opportunity of observing the appearance and conduct of the prisoner, and the attention he gave to the proceedings. I had also the benefit of the information of the physician of the prison and others to assist me in coming to that sound judgment which it was my duty to exercise. Giving the matter the due consideration to which it was entitled, I came to the conclusion that the prisoner knew where he was, what he was here for, and what was being done."

As to the information acquired by "observing the appearance and conduct of the prisoner," etc., it is perhaps all well enough so far as it goes, but it should not have been permitted to exclude the evidence of competent experts and others at hand. As to the information of the jail physician "and others," we are not informed how or when it was communicated. It does not appear, however, to have been in the shape of testimony in open court, and for aught we know it may have been mere hearsay. At best, neither of the sources of information referred to should ever be accepted as a substitute for competent evidence adduced in open court in the regular and orderly way. It would be a most dangerous precedent to sanction such a course of proceeding in any case.

It has been suggested that the jurors, impaneled to determine the guilt or innocence of the prisoner, were also authorized to pass upon the question of his insanity at the time of trial; and, inasmuch as they did not find, as part of their verdict, that he was then a lunatic, he has no right to complain that the preliminary inquiry was refused in the manner it was. That is a non sequitur. If his counsel had a right, as they undoubtedly had, to make the application in question, it was the plain duty of the court to hear the testimony they had to offer in support of it. If that had been done, it can scarcely be doubted the learned judge, in view of the evidence, would have been constrained to grant the request, and thus the prisoner would have had the benefit of the single inquiry as to whether he was then insane, and therefore incompetent to plead,

exercise his right of challenge and otherwise assist in conducting his defence.

I am clearly of opinion that the judgment should be reversed for manifest abuse of judicial discretion in not granting the application referred to, and especially in refusing to hear any competent evidence in support of it.*

4. It is not error to take a special verdict in a criminal case, especially where the facts are peculiar and the case itself lies upon the border: Commonwealth v. Chathams, 50 Pa. 181, followed and approved.

---

* On May 11, 1888, in Webber v. Commonwealth, writ of error to the Supreme Court of the United States allowed: per GORDON, C. J., May 30, 1888, motion of Mr. Graham, District Attorney, to revoke the order allowing said writ of error, refused: per GORDON, C. J.