## PHYLE *v.* DUFFY, WARDEN.

No. 655.   Argued April 20–21, 1948.—Decided June 7, 1948.

*Morris Lavine* argued the cause and filed a brief for petitioner.

*Clarence A. Linn,* Deputy Attorney General of California, argued the cause for respondent. With him on the brief was *Fred N. Howser,* Attorney General.

MR. JUSTICE BLACK delivered the opinion of the Court.

The petitioner is under sentence of death for murder in the first degree imposed by a California superior court and affirmed by the State Supreme Court. 28 Cal. 2d 671, 171 P. 2d 428. The validity of that sentence is

not here challenged.[1]   But § 1367 of the California Penal
Code provides that "A person cannot be tried, adjudged
to punishment, or punished for a public offense, while
he is insane." Thus if petitioner is insane, California
law prohibits his execution under the death sentence
which he received.   The legal questions here presented
relate to the procedures adopted by California to deter-
mine whether petitioner is sane or insane as a matter
of fact.

It is petitioner's contention that, though having been
pronounced insane in a judicial proceeding after his con-
viction, and though he in fact is still insane, he is about
to be executed because a state doctor, acting under au-
thority of state statutes, has declared him restored to
sanity.   The doctor reached his determination without
notice or hearings, and without any opportunity on peti-
tioner's part to obtain an original court hearing and
adjudication of his sanity, or even to obtain a court review
of the doctor's conclusion that he is sane.   This pro-
cedure it is argued constitutes a denial to petitioner of

---

[1] The opinion of the State Supreme Court affirming petitioner's
sentence shows: Upon arraignment in the Superior Court counsel
was appointed for petitioner at his request.   His pleas were "Not
guilty" and "Not guilty by reason of insanity."   Later petitioner
informed his counsel that he wished to withdraw these pleas and enter
a plea of guilty.   The trial judge then examined petitioner at length,
satisfied himself that the change of plea was voluntarily entered by
petitioner with full knowledge of his legal rights, and then accepted
it.   Evidence was then taken by the court to determine the degree
of the murder and to fix the punishment.   Two physicians appointed
by the court testified that in their judgment petitioner was sane.
Other witnesses testified to the facts of the crime.   The murder was
committed by petitioner while he was in the act of perpetrating a
robbery.   During the entire proceedings, so the State Supreme Court
found from the record, the appointed counsel participated and repre-
sented petitioner "with fidelity and proficiency." *People* v. *Phyle*,
28 Cal. 2d 671, 171 P. 2d 428.

that due process of law guaranteed him by the Fourteenth Amendment.

This contention was urged upon the California Supreme Court in habeas corpus proceedings there instituted. That court entertained and considered the petition, but, with two judges dissenting, denied relief, sustaining the validity of the power of the state's executive agents to follow the prescribed statutory procedures. 30 Cal. 2d 838, 186 P. 2d 134. We granted certiorari because of the serious nature of the due process contentions presented in the petition. 333 U. S. 841. Here the California attorney general, while supporting the State Supreme Court's denial of habeas corpus, asserts that California affords petitioner an adequate judicial remedy by way of mandamus, a procedure which has not yet been sought by petitioner.

The California procedure may perhaps be better understood by explaining the application of the controlling California statutes to petitioner's case. While he was in prison awaiting execution of the death sentence a question arose concerning the petitioner's sanity at that time. Section 3701 of the State Penal Code [2] prescribes that if "there is good reason to believe" that a defendant under sentence of death "has become insane, the warden must call such fact to the attention of the district attorney." It is the district attorney's "duty" immediately

---

[2] "3701. Insanity of defendant, how determined. If, after his delivery to the warden for execution, there is good reason to believe that a defendant, under judgment of death, has become insane, the warden must call such fact to the attention of the district attorney of the county in which the prison is situated, whose duty it is to immediately file in the superior court of such county a petition, stating the conviction and judgment, and the fact that the defendant is believed to be insane, and asking that the question of his sanity be inquired into. Thereupon the court must at once cause to be summoned and impaneled, from the regular jury list of the county, a jury of twelve persons to hear such inquiry."

to institute proceedings in an appropriate trial court to determine the sanity of the defendant, and the court "must at once" summon a jury of twelve to "hear such inquiry." In petitioner's case this prescribed course was followed, a judicial hearing was held as provided by § 3702,[3] and petitioner was adjudged insane. In accordance with § 3703 [4] the court then ordered that petitioner "be taken to a state hospital for the insane and be there kept in safe confinement until his reason is restored." It will be noted that the petitioner obtained a judicial hearing as to sanity only because the warden instituted proceedings after determining that there was "good reason to believe" that the petitioner was insane. Thus, the opportunity for a person under sentence of death to have a hearing before judge and jury on the question of his sanity depends in the first instance solely on the warden.

After adjudication of insanity the petitioner was taken to a state hospital for the insane in compliance with the trial court's order of commitment. In accordance with § 3704 [5] the warden then suspended the death sen-

---

[3] "3702. Duty of district attorney upon hearing. The district attorney must attend the hearing, and may produce witnesses before the jury, for which purpose he may issue process in the same manner as for witnesses to attend before the grand jury, and disobedience thereto may be punished in like manner as disobedience to process issued by the court."

[4] "3703. Convict found insane. The verdict of the jury must be entered upon the minutes, and thereupon the court must make and cause to be entered an order reciting the fact of such inquiry and the result thereof, and when it is found that the defendant is insane, the order must direct that he be taken to a State hospital for the insane, and there kept in safe confinement until his reason is restored."

[5] "3704. Convict found sane: Duties of warden. If it is found that the defendant is sane, the warden must proceed to execute the judgment as specified in the warrant; if it is found that the defendant is insane, the warden must suspend the execution and transmit a

tence and delivered certified copies of the court's order to the governor and to the medical superintendent of the state hospital to which petitioner was sent. As § 3704 provides, the superintendent was directed that when petitioner "recovers his reason," the superintendent "must certify that fact" to the governor, who is then required to issue to the warden his warrant appointing a day for the execution of the judgment. The warden then returns the defendant to the state prison pending the execution of the judgment. This course was followed with reference to the petitioner. Eighteen days after his admission to the state hospital the medical superintendent certified to the governor that the petitioner was then sane. He was returned to the custody of the prison warden, and the governor set a new date for his execution.

The medical superintendent's determination of petitioner's sanity was based on his own *ex parte* investigation, no notice or hearings having been afforded petitioner or any person on his behalf. It is thus clear that the California statutory scheme here challenged provides neither an administrative nor a judicial hearing as a prerequisite to a determination that a condemned defendant judicially adjudicated to be insane has been restored to sanity; one man in an *ex parte* investigation decides the question upon which hangs the defendant's life, in the absence of a later request by the prison warden for

certified copy of the order mentioned in the last section to the Governor and deliver the defendant, together with a certified copy of such order, to the medical superintendent of the hospital named in such order. When the defendant recovers his reason, the superintendent of such hospital must certify that fact to the Governor, who must thereupon issue to the warden his warrant appointing a day for the execution of the judgment, and the warden shall thereupon return the defendant to the State prison pending the execution of the judgment."

a judicial hearing on the ground that there is then "reason to believe" the defendant has become insane.

The holding of the State Supreme Court in the habeas corpus proceeding was:

> "There is no authority . . . for the proposition that defendant has a right to habeas corpus or other judicial proceeding to determine the question of his sanity after his release from the state hospital. In fact, section 3700 of the Penal Code [6] expressly prohibits such a proceeding. Once the superintendent certifies that defendant is sane, he is remanded to the custody of the warden for execution and 'No judge, court or other officer other than the Governor' can then suspend the execution of the judgment, 'except the warden of the State Prison to whom he is delivered. . . .'" *In re Phyle,* 30 Cal. 2d at 842–843, 186 P. 2d at 137.

For the statements in its opinion that the due process clause of the Fourteenth Amendment conferred no right on a condemned defendant to any kind of judicial adjudication or review on the question of sanity, the State Supreme Court primarily relied on *Nobles* v. *Georgia,* 168 U. S. 398. We do not think that either the actual holding or what was said in the opinion in that case would necessarily require a rejection of the contentions made here against the California procedures.

The Georgia law under scrutiny in the *Nobles* case provided that the sanity of a person previously condemned to death should be determined by a tribunal formed in the following manner: "The sheriff of the

---

[6] "3700. Governor may suspend. No judge, court, or officer, other than the governor, can suspend the execution of a judgment of death, except the warden of the State prison to whom he is delivered for execution, as provided in the six succeeding sections, unless an appeal is taken.

county, *with the concurrence and assistance of the Ordinary thereof,* [emphasis added] shall summon a jury of twelve men to inquire into such insanity . . . ." If this tribunal found insanity the sheriff was required to suspend execution of sentence and report his action to the presiding judge. Restoration of sanity so as to justify execution was to be determined by the presiding judge "by inquisition or otherwise." Thus "the only question" in the *Nobles* case, as the Court there said, was "whether . . . in order to constitute due process of law" the question of insanity of a condemned defendant must "be tried by a jury in a judicial proceeding surrounded by all the safeguards and requirements of a common law jury trial, and even although by the state law full and adequate administrative and *quasi* judicial process is created for the purpose of investigating the suggestion." P. 405. This agency for a hearing to inquire into the prisoner's sanity, composed as it was of sheriff, county judge and jury, was referred to as an "apt and special tribunal." There is provision in the California statutes for a hearing before a judge and jury when, but only when, the warden is of opinion that there "is reason to believe" a defendant is insane.

The *Nobles* case does stand for the proposition that a condemned defendant has no "absolute right" to a hearing on the question of his sanity on his mere "suggestion." Such an absolute right, this Court thought, would make the punishment of a defendant "depend solely upon his fecundity in making suggestion after suggestion of insanity, to be followed by trial upon trial." P. 406. For this reason, the Court in the *Nobles* opinion cited and quoted from legal commentators and from judicial opinions which emphasized, as the opinion in the *Nobles* case itself emphasized, the importance of leaving to the "discretion of a judge" the most appropriate procedure for determining

the sanity of a defendant already sentenced to death. It was in this connection that the Court made the statement in the *Nobles* case upon which the California Supreme Court particularly relied, that "the manner in which such question should be determined was purely a matter of legislative regulation."

Reading this statement in its context and in relation to the Georgia procedure, we do not understand that the Court in the *Nobles* case passed upon the question here urged: whether a state which bars the execution of insane persons can submit to a single individual this question, crucial to life, to be decided by that individual *ex parte*, with or without notice and hearings as the individual may choose, and without any judicial supervision, control or review whatever. The *Nobles* case we do understand to be an authority for the principle that a condemned defendant cannot automatically block execution by suggestions of insanity, and that a state tribunal, particularly a judge, must be left free to exercise a reasonable discretion in determining whether the facts warrant a full inquiry and hearing upon the sanity of a person sentenced to death.[7]

What has been said previously indicates the gravity of the questions here raised under the due process clause as heretofore construed by this Court, both the contention that execution of an insane man is offensive to the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions, *Adamson* v. *California*, 332 U. S. 46; *Carter* v. *Illinois*, 329 U. S. 173, and the different contention that life shall not be taken by a state as the result of the unreviewable *ex parte* determination of a crucial fact made by a single executive officer. See *Ng Fung Ho* v. *White*, 259 U. S.

---

[7] See cases collected in 49 A. L. R. 804, *et seq.*

276.[8]   It is not appropriate for us to pass on such consti-
tutional questions in this habeas corpus case if, as the
California attorney general contends, there is a state rem-
edy by mandamus available to petitioner under which he
can invoke judicial action to compel the warden to initiate
judicial proceedings, and in which mandamus proceedings
the court will hear and consider evidence to determine
whether there is "reason to believe" that the petitioner is
insane.   *New York ex rel. Whitman* v. *Wilson, Warden,*
318 U. S. 688; *Woods* v. *Nierstheimer,* 328 U. S. 211; *Car-
ter* v. *Illinois,* 329 U. S. 173.   See also *Simon* v. *Craft,* 182
U. S. 427, 437.

The State Supreme Court in denying habeas corpus said
that the state statutes made "no provision for a judicial
determination of the question of the sanity of a defendant
delivered to the warden of a state prison for execution
except as set forth in" § 3701.   That is the section which
requires a judicial inquiry with a court and jury only
when and if the warden certifies that "there is good reason
to believe" that a person sentenced to death has "become
insane."   But it does not necessarily follow from the fact
that petitioner cannot obtain a full-fledged judicial hear-
ing as to sanity on his own motion made directly to a state
court that he is without some other adequate state remedy.
And the state attorney general asserts here that the peti-
tioner does have an "ample remedy, if the facts support
him, by application to the California courts for a writ of
mandamus" to compel the warden to institute proceedings
under § 3701.

---

[8] See also *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369–370; *Regal Drug
Corp.* v. *Wardell,* 260 U. S. 386, 392; *Duncan* v. *Kahanamoku,* 327
U. S. 304, 322; *Dent* v. *West Virginia,* 129 U. S. 114, 123–124; *Brown*
v. *New Jersey,* 175 U. S. 172, 176; *St. Joseph Stock Yards Co.* v.
*United States,* 298 U. S. 38, 49–54, and concurring opinion, Brandeis,
J., at 76–78.   Cf. *United States* v. *Ju Toy,* 198 U. S. 253, 263; *Simon*
v. *Craft,* 182 U. S. 427, 436.

Thus we have an unequivocal declaration by the state attorney general that petitioner has not attempted to take advantage of an available state remedy. The attorney general is the highest non-judicial legal officer of California, and is particularly charged with the duty of supervising administration of the criminal laws.[9] His statement on this question is entitled to great weight in the absence of controlling state statutes and court decisions.[10] Nor is there anything in the State Supreme Court's opinion in this case that need be considered in conflict with the attorney general's opinion. While that court held that there was no statutory provision for petitioner to obtain a sanity hearing except through action by the warden as prescribed in § 3701, it did not hold or even consider whether there was judicial power under state law to compel the warden to do his duty under § 3701. It did declare, clearly and emphatically, that the statute imposed a mandatory obligation on the warden to initiate judicial proceedings if there was good reason to believe a condemned defendant insane, an obligation that continued to rest upon the warden even after certification of restoration to sanity by the medical superintendent. The Supreme Court also declared that this duty would continue up to the very time of execution. Failure of the warden to perform this obligation, so the court said, would be a "violation of . . . section 1367," which section prohibits execution of an insane man. In view of this mandatory obligation upon the warden to initiate proceedings if "there is good reason to believe" a defendant sentenced to death is insane, it would be somewhat anomalous, to say the least, if California courts were wholly without power to correct an executive agent's abuse of authority in a

---

[9] California Government Code §§ 12510–12512, 12519, 12550–12553.

[10] See *Union Ins. Co.* v. *Hoge,* 21 How. 35, 66; *Fox* v. *Standard Oil Co.,* 294 U. S. 87, 96; *Driscoll* v. *Edison Co.,* 307 U. S. 104, 115.

matter of such great significance as the execution of insane persons.

The jurisdiction of California courts to issue mandamus has its source in Art. VI, §§ 4, 4b, 5 of the state constitution. The writ can issue to any inferior tribunal or person to compel an act which the law specifically enjoins. Code of Civil Procedure of California, § 1085. It has been held that the writ may issue against the secretary of state, *Hutchinson* v. *Brown,* 122 Cal. 189, 54 P. 738, or even against the governor. *Elliott* v. *Pardee, Governor,* 149 Cal. 516, 520, 86 P. 1087, 1089.

Petitioner contends, however, that mandamus would not be available under California law if there is another adequate remedy, see *Kahn* v. *Smith,* 23 Cal. 2d 12, 142 P. 2d 13, that here habeas corpus is available, and hence mandamus is not. This contention is fully answered by the State Supreme Court's opinion in this case, holding that neither habeas corpus nor any other remedy is available to test sanity of a condemned defendant, except that remedy under § 3701 which only the warden can institute. Hence, so far as it here appears, mandamus to compel action by the warden is the only available remedy.

Petitioner contends that this remedy is inadequate because under California law no relief could be hoped for in a mandamus proceeding without a showing that the warden's non-action was arbitrary and capricious. We cannot know, of course, just what precise standards the State Supreme Court may hold must be met by petitioner in order to obtain the judicial inquiry provided in § 3701. We are persuaded by the attorney general's statements and brief, and by the state constitution, state statutes, and state decisions to which he referred, that mandamus is probably available, and that in a mandamus proceeding some issues of fact concerning petitioner's sanity can be drawn by the parties, resolved by the courts,

and provide support for relief. Different language has been used in different opinions concerning the conditions upon which the writ will issue in California. Although it has been said that generally the writ will issue only to correct an abuse of discretion, *Bank of Italy* v. *Johnson,* 200 Cal. 1, 31–33, 251 P. 784, 795–796 and cases cited, it has also been pointed out that in some circumstances writs can issue to compel action in a particular way. *Wood* v. *Strother,* 76 Cal. 545, 549, 18 P. 766, 769; *Landsborough* v. *Kelly,* 1 Cal. 2d 739, 744, 37 P. 2d 93, 95.

In considering what the issues may be in a mandamus proceeding, it must be borne in mind that the warden is under a mandatory duty to initiate judicial proceedings, not *when* a defendant is insane, but when *"there is good reason to believe"* he is insane. We cannot say at this time that California's remedy by mandamus will be less than a substantial equivalent[11] of one which authorized him to apply directly to a court for a full hearing. For this Court held in *Nobles* v. *Georgia, supra,* that in the absence of sufficient reasons for holding a full hearing into the sanity of a defendant sentenced to death, a state judge may deny such a hearing consistently with due process. As previously pointed out, the decision in the *Nobles* case emphasized that due process of law had never necessarily envisioned a full court hearing every time the insanity of a condemned defendant was suggested. Applications for inquiries into sanity made by a defendant sentenced to death, unsupported by facts, and buttressed by no good reasons for believing that the defendant has lost his sanity, cannot, with any appropriate regard for society and for the judicial process, call for the delays in execution incident to full judicial inquiry. And a court can just as satisfac-

---

[11] See *Edison Co.* v. *Labor Board,* 305 U. S. 197, 234; *Opp Cotton Mills, Inc.* v. *Administrator,* 312 U. S. 126, 152–153.

torily determine by mandamus as by direct application whether there are good reasons to have a full-fledged judicial inquiry into a defendant's sanity.

In this situation we find no federal constitutional question presented which is ripe for decision here. So here, as in *Woods* v. *Nierstheimer, supra,* being unable to say that the judgment denying habeas corpus may not rest on an adequate non-federal ground, the writ of certiorari is

*Dismissed.*

Mr. Justice Frankfurter, whom Mr. Justice Douglas, Mr. Justice Murphy, and Mr. Justice Rutledge join, concurring.

Where life is at stake one cannot be too careful. I's had better be dotted and t's crossed. And so I deem it proper to state my understanding of the opinion of the Court, on the basis of which I concur in it.

We granted certiorari to review a decision of the Supreme Court of California which dismissed *habeas corpus* proceedings brought in that court. We did so on the assumption that the case raised questions under the Fourteenth Amendment—more particularly, whether an unreviewable determination by the superintendent of a State hospital, that one convicted of murder and found to have become insane after conviction had been restored to sanity and therefore was subject to execution, was consistent with the due process which the Fourteenth Amendment secures. The Court now finds that all that the California Supreme Court did was to hold that as a matter of California procedure the petitioner's claim could not be passed on by the direct remedy of *habeas corpus,* but that there is available a special local remedy, labeled mandamus, whereby the petitioner can judicially test his present sanity. In short, the Court dismisses the writ of certiorari because the decision of the court below rests on

a purely State ground in that there is a State remedy available, which has not been pursued, by means of which he can secure the rights he claims under the United States Constitution.

Of course I recognize the weight to be attached to the Attorney General's views regarding the law of California. But the controlling voice on California law is that of the Supreme Court of California. Whatever may be the elegancies of procedure by which the matter is to be determined, our decision declining to consider the grave constitutional issues which we thought we had before us, is contingent upon a determination by the Supreme Court of California that the law of that State is what our decision presupposes it to be, namely, that California by a remedy which California chooses to call mandamus enables the present petitioner to secure a judicial determination of his present sanity. This means, of course, not the very restricted scope of relief which is normally associated with the traditional remedy of mandamus. It presupposes that California affords petitioner the means of challenging in a substantial way the *ex parte* finding of the Superintendent of the State Hospital for the Insane and enables him to secure judicial determination of the claims he has made in his petition for *habeas corpus* which, so the Court now holds, is not the proper way to proceed.

Upon this view I concur in the decision and opinion of the Court.