Commonwealth ex rel. Smith *v.* Ashe, Warden et al.

Argued December 6, 1949. Before MAXEY, C. J., STERN, STEARNE and JONES, JJ.

 reargument refused February 9, 1950.

*Thomas D. McBride,* with him *Herbert S. Levin,* for relator.

*T. McKeen Chidsey,* Attorney General, with him *Randolph C. Ryder,* Deputy Attorney General, *Colbert C. McClain* and *James W. Tracey, Jr.,* Assistant District Attorneys, for respondents.

OPINION BY MR. CHIEF JUSTICE MAXEY, January 20, 1950:

A petition for writ of habeas corpus is now filed by James Smith, who on his own plea of guilty was adjudged guilty of murder in the first degree, and sentenced to death. This judgment and sentence were on June 24, 1949, affirmed by the Court (362 Pa. 222, 66 A. 2d 764). The core of the petition is that Smith was permitted to plead guilty without having the question of his sanity formally adjudicated and that psychiatrists were not supplied him by the State as witnesses. The petition contends that due process of law required this because in June 1945 Smith had been committed as "insane" to a mental institution in Brooklyn, N. Y., even though on October 11, 1945, he was officially discharged from that institution as "recovered, sane, and capable of understanding".

The petition alleges that counsel endeavored to obtain a psychiatric examination of the relator, but without success, and that they were "unable to competently

determine whether Relator was either insane at the time
the offense was committed, or sane, able to comprehend
the charges against him, and able to coöperate in his
defense . . . Without expert testimony, Relator [claims
that he] could not have overcome the presumption of
sanity and capacity to stand trial and could not have sus-
tained his plea of 'not guilty', if such a plea had been
based on his insanity at the time of the offense". It is
further stated that the relator's counsel in a conference
with Judge GUERIN and with Assistant District Attor-
ney McClain agreed that the plea of "not guilty" be
changed to "guilty", that the Commonwealth would
present its testimony before the court en banc, and that
the case be then postponed sufficiently to allow counsel
to subpoena the New York records of Smith's mental
condition and that if these records raised doubt of rela-
tor's sanity, the court would consider the withdrawal
of the plea of "guilty".

The plea of "guilty" was entered on September 21,
1948, and on the same day the Commonwealth presented
its evidence as to the crime. The petition then says:
"On the same day, September 21, 1948, the court ad-
judged Relator guilty of Murder of the first degree with-
out having received in evidence and without having con-
sidered the records as to or the question of Relator's
sanity, his capacity to plead Not Guilty, change his
plea to Guilty, participate in the hearing, coöperate with
counsel, and make his defense.[1] On October 28, 1948,
and November 5, 1948, the court heard further testimony
on the issue of penalty only. Although the testimony
raised a doubt as to Relator's sanity and mental capacity
to plead and stand trial, or participate in the hearing,

---

[1] Whether he had been adjudged guilty of murder in the first
degree on September 21, 1948 or on February 4, 1949 is a fact in
dispute which we will discuss later in this opinion.

coöperate with counsel and make his defense, the guilty plea was not permitted to be withdrawn." [2]

On February 4, 1949, Smith was formally sentenced to death by electrocution. He appealed to this Court and the *sole question* raised was: "Did the Court below abuse its descretion in imposing the death penalty after appellant's plea of guilty, in view of appellant's background and mental history?"

In their brief on that appeal counsel said: "We advised the trial court of our concern 'whether the plea of guilty was proper, since (we) had no means of obtaining a psychiatric examination' before entering the plea. . . . Unadvised by psychiatrists, we could not 'properly cross-examine Dr. Drayton [3] or prepare or present the defense, either in establishing insanity as a complete defense or in mitigation of the penalty.' The defendant did not receive 'adequate representation, for our hands were tied, our tongues muted and our minds unenlightened.' "

The *petition* sets forth the denial of clemency by the Board of Pardons [4] on September 21, 1949, the fixing of the date of execution, and that on September 24, 1949, habeas corpus proceedings were instituted before the United States District Court for the Eastern District of

---

[2] This statement conveys an erroneous impression. Habeas corpus proceedings in behalf of Smith were begun in the United States District Court at Philadelphia, and on October 4, 1949, testimony was taken there. With the acquiescence, at bar, of the respective counsel, this testimony was made a part of the record of the proceeding here. It shows (1) that defendant's counsel never asked to withdraw the plea of guilty which they had entered on behalf of their client and (2) that the members of the court en banc after hearing the testimony of psychiatrists and observing Smith, had no doubt of Smith's sanity.

[3] Dr. Drayton had been directed by the court to examine the defendant as to his mental condition and report to the court. His findings are hereinafter referred to.

[4] Before denying clemency the Board of Pardons had an investigation made of Smith's mental condition.

Pennsylvania.[5] In the proceedings in the District Court there was testimony by the relator's counsel, by the three judges of the Court of Oyer and Terminer of Philadelphia County and by Dr. Baldi, Superintendent of the Philadelphia County Prison.

In that hearing these facts were brought out: The case was listed for trial before Judge SLOANE on March 17, 1948, but was postponed on defendant's counsel's statement that he had not been able to secure the desired medical evidence from New York. Counsel [6] then suggested the appointment of a commission under Section 308 of The Mental Health Act of 1923, Act of July 11, 1923, P. L. 998, as amended, 50 PS Sec. 48,[7] to examine the relator.

Judge SLOANE called counsel's attention to the case of *Commonwealth v. Dunn*, 47 D. & C. 685, which ruled that under this statute only officers in charge of the institution where the prisoner is being detained are proper petitioners. Judge SLOANE also informed counsel that he would consult with Dr. Frederick S. Baldi, physician at the Philadelphia County Prison, concerning possible institutional proceedings under this Act. He did this and Dr. Baldi expressed the opinion

[5] The District Court held that it was without jurisdiction in the matter because at the time the proceedings were instituted the relator was closely approaching Rockview Prison in Center County, Pennsylvania, and was about 100 miles beyond the territorial jurisdiction of the Court.

[6] This Act cannot be invoked by counsel.

[7] Section 308 of The Mental Health Act of July 11, 1923, P. L. 998, provides that when any person detained in any prison, whether awaiting trial or undergoing sentence shall, in the opinion of the superintendent, jail physician, warden, or any other official, be insane, the said superintendent, jail physician, warden, or other official, shall make application immediately to a law judge of the proper court, for commitment of said person to a proper hospital for mental diseases. The proper court's judge shall forthwith order an inquiry by two qualified physicians who shall immediately make examination of the prisoner and report their findings.

that the relator was not insane and he refused to request the appointment of a commission to investigate the relator's insanity.

On March 19, 1948, a petition was presented to Judge FLOOD for the appointment of a commission to inquire into the relator's mental condition. The petition was dismissed for the reason that the petitioner was not a proper party.

The indictment was then listed for trial on April 20, 1948, before Judge KUN. Having been unable to secure the desired evidence from the mental institution in the State of New York, Mr. Levin prepared a petition for leave to withdraw his appearance, which was allowed on April 15, 1948. Judge KUN then appointed Mr. Levin and Harry S. Berkowitz as counsel, appointment being made under the Act of March 22, 1907, P. L. 31, sec. 1, 19 PS 784. The trial was continued to May 24, 1948, at which time it was listed for trial before Judge LEWIS. It was again continued because counsel had not been able to secure the evidence from New York State. It was then listed for trial before Judge MAWHINNEY and again continued, and next listed for trial on September 21, 1948, before Judge GUERIN.

About two weeks prior to September 21, 1948, Judge GUERIN conferred with relator's counsel about this case and, in accordance with Judge GUERIN's testimony, relator's counsel "presented a situation indicating we could not go on with the trial of the case without the advantage of testimony from the hospital records in Brooklyn and in New York" and that it was represented by counsel that they had been refused these records and that it would be necessary for them to resort to a petition under the Uniform Subpoena Act, and then procure a proper order in the New York Court, which would require six or seven weeks. Judge GUERIN then agreed to permit the "case to be called and not follow

the usual custom, but continue its trial until its termination and . . . [he] would permit the Commonwealth to introduce its evidence and . . . then set a day after allowance of the petition at which time the records could be brought from New York". Relator's counsel then informed him that "they would enter a plea of guilty generally, and request . . . [him] to obtain two fellow Judges to sit with . . . [him] and hear the trial on the plea of guilty generally". Pursuant to this arrangement, Judge GUERIN called in CARROLL and SLOANE, JJ., to sit with him as a court en banc. Relator's *counsel made no request either at the pre-trial conference or at any other time for the appointment of a psychiatrist* to assist them in the preparation and presentation of the cause. After the matter was fully explained to the relator by his counsel, and his consent to the proposed course given, on September 21, 1948, the former plea of not guilty was withdrawn and a plea of guilty generally, entered, the Commonwealth put in its evidence, a petition to secure the desired records from the mental institutions in the State of New York was presented and granted, and the case continued until October 27, and then to October 28, 1948, at which time the *relator* introduced the testimony of Dr. Fred Adams, a psychiatrist connected with the Kings County Hospital, Kings County, New York, who had, in June of 1945, together with a psychiatrist and psychologist of that institution, at the request of the County Court of Brooklyn, New York, examined the relator, diagnosed his mental condition as "psychosis, schizophrenia, hebephrenic type" a "mental disturbance characterized usually by illusions, hallucinations referable to the idea of persecution or grandeur", concluded that he was then "insane, not imbecile, and . . . [was] not capable of understanding the charge against him, the proceedings against him and of making his defense", and recommended that he "be

committed to a hospital for the insane such as Brooklyn State Hospital, for the treatment of his mental condition".

Dr. Clarence H. Bellinger, Senior Medical Director, of the Brooklyn State Hospital, Brooklyn, New York, testified that the relator was admitted to that institution on June 19, 1945, was examined by a psychiatrist and the diagnosis of the Kings County Hospital substantially confirmed except that the psychosis was concluded to be "catatonic" rather than "hebephrenic"; that the relator improved while at that institution, and, as a result of an examination by the witness on October 9, 1945, was released to the New York City authorities on October 11, 1945, "as having recovered from any mental illnesses which he had. He was clear and lucid."

Relator's counsel then told the court that, in view of the evidence adduced, the relator was "entitled to have some psychiatrist examine him". The court acquiesced in this and the proceeding was adjourned to November 5, 1948. At the request of the court Dr. William Drayton, Jr., Chief of the Neuro-psychiatric Department of the Philadelphia General Hospital, examined the relator, after having read the prior testimony, including the records from the Brooklyn State Hospital, which had already been placed in evidence. Dr. Drayton's diagnosis was that the relator "is of average intelligence; no psychosis, psychotically and neurologically negative" and he "was not only sane at the time of the commission of the crime charged in the indictment, but was then, on November 5, 1948, sane." The relator's counsel extensively examined Dr. Drayton.[8]

---

[8] While confined to the Philadelphia County Prison Smith was examined by the Medical Director, Dr. Henry F. Page, on March 8, 1948, who reported that defendant was "quiet, cooperative, lucid, oriented in all spheres, and in possession of insight into his predicament."

The three-judge Court of Oyer and Terminer of Philadelphia County being convinced that Smith was sane, accepted the plea of guilty as the plea of a man capable of understanding and it found in the medical testimony no reason for the withdrawal of the plea. Relator's counsel also must have had no doubt of their client's sanity for they made no request for the withdrawal of the plea of guilty. Since the murder committed by Smith was in the attempted perpetration of a robbery he was correctly adjudged guilty of murder in the first degree and the penalty imposed was appropriate.

The judgment having been affirmed by the court the only question now before us is the question raised by the petition for this "extraordinary remedy", i.e. the writ of habeas corpus, which petition asserts that the record discloses a denial to Smith of his right to due process of law.

In *Commonwealth ex rel. McGlinn v. Smith,* 344 Pa. 41, 24 A. 2d 1, we said: ". . . that 'The writ of habeas corpus can never be used as a substitute for an appeal. . . . The regularity of proceedings is not to be attacked in this way': . . . [and that] 'The writ of habeas corpus should be allowed only when the court or judge is satisfied that the "party hath probable cause to be delivered" ': 3 Blackstone 132, [and that] . . . 'A judgment cannot be lightly set aside by collateral attack even on habeas corpus. When collaterally attacked, the judgment of a court carries with it a presumption of regularity': Johnson v. Zerbst, 304 U. S. 458, [and that] . . . The remedy of habeas corpus being an extraordinary one, it can be successfully invoked only in exceptional cases, where there is a 'peculiar and pressing need for it.' In Goto v. Lane, 265 U. S. 393, 401, the Supreme

---

Smith had served in the United States Army from June 26, 1941, to June 29, 1944. He was a Staff Sergeant twice but was demoted for insubordination. He received a medical discharge.

Court of the United States in an opinion by Justice VAN DEVANTER said: 'The remedy is an extraordinary one, out of the usual course, and involves a collateral attack on the process or judgment constituting the basis of the detention. The instances in which it is granted, when the law had provided another remedy in regular course, are exceptional and usually confined to situations where there is peculiar and pressing need for it or where the process or judgment under which the prisoner is held is wholly void. This case does not measure up to that test.' " Neither does the instant case.

In *Bowen v. Johnston*, 306 U. S. 19, the Supreme Court of the United States said: "The scope of review on habeas corpus is limited to the examination of the jurisdiction of the court whose judgment of conviction is challenged. (Citing cases) But if it be found that the court had no jurisdiction to try the petitioner, or that in its proceedings his constitutional rights have been denied, the remedy of habeas corpus is available." (Citing cases)

Relator's counsel cites the case of *Commonwealth ex rel. Townsend v. Burke*, 361 Pa. 35, 63 A. 2d 77, and says that this case "seems controlling here". The comment of relator's counsel on that case is as follows: "In that case Townsend pleaded guilty without the assistance of counsel in a non-capital case. Some years afterwards he applied to this Court for a writ of habeas corpus asserting a violation of federal rights. The writ was denied. The Supreme Court of the United States reviewed this denial on certiorari and reversed on the ground that although failure to appoint counsel in a non-capital case is not necessarily fatal, yet where, in the proceedings resulting in judgment, defendant is overreached in a way that counsel might have prevented had he been appointed, the proceeding is fundamentally unfair and relator is entitled to relief on habeas corpus. When the

case came back to this Court the plea of guilty as well as the sentence was stricken and relator returned to his status prior to plea."

The difference between that case and the instant case is that in the instant case defendant was represented by counsel at each stage of the proceedings and, therefore, there was no denial of his fundamental right to counsel. In the brief of relator's counsel appears this statement: "The theory upon which relief is granted on habeas corpus is that the judgment is void (a) for want of jurisdiction, (b) for excess of jurisdiction or (c) for loss of jurisdiction by reason of the fact that the court proceeded to judgment in a fundamentally unfair way." Our answer to that statement is that in this case there *was no want* of jurisdiction, *no excess* of jurisdiction and *no loss* of jurisdiction for any reason and no "proceeding to judgment in a fundamentally unfair way".

Relator's counsel say in their brief: "Our position is: (1) Upon a prima facie showing the court must see to it that the issue [of insanity] is decided. (2) It is *not* essential that it be decided by a jury. (3) It *is* essential that due process be observed in that there be notice, opportunity to present testimony, and opportunity for hearing and argument. (4) The state can make no distinction so far as basic fundamental procedure is concerned between an alleged insane person who is awaiting trial (presumptively innocent) and one who is not charged with any offense. (5) The hearing is not merely to satisfy the 'conscience of the court' but to decide a fact upon which a constitutional right depends." The brief then notes that this Court said in *Webber v. Commonwealth*, 119 Pa. 223, 13 A. 427, that under the common law the court itself could try the issue *in limine* or by a jury impanelled for that purpose; and in *Commonwealth v. Scovern*, 292 Pa. 26, 140 A. 611,

the Court held that the issue of insanity in bar of trial could be submitted to the jury trying the very indictment itself. Counsel then adds: "such a course, whether or not justified under the old common law, does not now meet the test of due process. There are many things that were done under the common law that do not now meet that test. For instance, at common law a defendant charged with felony was not permitted to testify; yet there can be no doubt that at the present time a denial of such a right would violate due process. Counsel then adds: "The situation must be met fairly and it must be held either that the defendant is not entitled to have his sanity disposed of at all or he is entitled to have it disposed of before trial in a separate issue. If it is disposed of before trial and he is found to be insane, that ends the matter unless and until he is restored. If he is found to be mentally competent to defend, he must do so or take the consequences."

We interpret the foregoing contention to mean that when a person is charged with the commission of a crime and it appears that he was once committed to an insane asylum and afterwards discharged from the asylum as "recovered and sane and capable of understanding the charges pending against him", nevertheless, there must be some kind of a trial to determine the question of his contemporary state of mind before he can be put on trial for the indictment confronting him. *Such is not the law.* The court before whom a defendant is arraigned for a crime has wide discretion in determining whether or not he is in a state of mind to be tried and is under no duty to conduct such a "sanity hearing" as relator's counsel now contends for, and this is particularly true when, as here, there was no such request made for any such hearing. Neither is the court in such a situation bound to provide defendant counsel with psychiatrists to examine the prisoner. When this defendant, Smith,

pleaded guilty to the murder of John J. Haines the trial court was aware of the following facts:

1. That though the prisoner was confined to a jail which had a superintendent and an experienced and well qualified physician, neither the superintendent nor the physician made any move to have the prisoner committed to an institution as an insane person. The inference which the court had the right to draw from this fact was that the prisoner was *not* insane.

2. That though Smith had been committed on June 13, 1945, to an insane asylum in Brooklyn as "presently insane" he was later discharged by the qualified medical director of that institution as "sane and capable of understanding" and as having "recovered" from his mental illness. In the order made by County Judge NATHAN R. SOBEL on October 10, 1945, official notice was taken of Smith's recovery from his mental illness.[9]

3. Relator's counsel made no request of the court at any time for the appointment of a psychiatrist to assist them in the preparation of a defense for their client. While under Pennsylvania statutes there is no provision for the State to furnish such a psychiatrist, Judge CARROLL of the Court of Oyer and Terminer which heard Smith's case testified in the habeas corpus proceedings before the United States District Court that if a psychiatrist had been "asked for" by defendant's counsel"

---

[9] The order reads as follows: ". . . Now, on reading and filing the certificate of Dr. Clarence H. Bellinger, Director of the Brooklyn State Hospital, dated October 9th 1945, that the said James Smith has recovered from his mental illness so that at the present time he understands the nature of the charges against him and is able to confer with counsel in the preparation of his defense, it is ORDERED, that the Director of the Brooklyn State Hospital be, and he hereby is, authorized and directed to deliver the said James Smith to the Department of Corrections of the City of New York, who shall convey said defendant and confine him in the City Prison, Brooklyn, until he is recalled for judgment on the conviction herein."

the defendant could have had a psychiatrist.[10] In fact, the court did appoint Dr. William Drayton, Jr., a qualified psychiatrist, to examine Smith and to report to the court as to Smith's mental condition (as hereinbefore stated).

4. Dr. Drayton took the witness stand, and was examined and cross-examined as to Smith's condition. He testified that there was no evidence of Smith having a psychosis at that time (1948) and that he "believed" that Smith was not psychotic when he shot and killed Haines, that he was of average intelligence and that he had completely recovered from the mental illness of which there had been any prior history, and that he appreciated the difference between right and wrong. Under these circumstances there was no denial of the due process of law in placing defendant on trial without any further investigation of his mental state.

This Court, as was the trial court, is confronted with the fact that the experienced counsel for the relator entered a plea of guilty to the indictment charging him with murder. Since no insane person can be guilty of murder, the fact that Smith's counsel freely entered for him a plea of guilty, reasonably gives rise to the inference that his counsel believed Smith sane.[11] Now

———
[10] Judge GUERIN in the habeas corpus proceedings said that neither of defendant's counsel ever asked for the appointment of a psychiatrist to assist them in the defense of this case with their testimony, or whether to plead this man guilty.

[11] Judge CARROLL (in the same proceedings) was asked why the Court did not direct that the plea of guilty be withdrawn. He replied: "There was no occasion to do so either in fact or in law. . . . No Judge that tries a homicide case . . . would ever permit a defendant to go to trial where there was a suspicion of insanity and where there would be removed from him his fundamental right to defend on the basis of insanity, . . ."

counsel contends that the insanity with which Smith was afflicted in 1945 was permanent. If it was, he was insane at the time he committed the murder charged and it was the duty of the defendant's counsel to ask to have the issue of his sanity determined by a court and jury as provided by Section 67 of the Act of March 31, 1860, P. L. 427, 19 P.S. 1352. In the opinion of the trial judges Smith was sane.

The claim that relator was denied due process of law is based on several basic errors. The first error is that when a defendant has been adjudged insane the presumption is that his insanity continues. *This is not the law.*

In *Com. v. Cilione*, 293 Pa. 208, 142 A. 216, this Court held that a prior finding of insanity, where the cause

---

Judge GUERIN was asked: "Was there any inhibition on the part of counsel to ask for a change of plea even after a plea of guilty was entered?" He replied: "There was not, although Judge CARROLL suggested it might be their duty to do so." He was also asked: "So, therefore, it was understood that a time in the case might come when it would be advisable in the interests of justice that the plea be withdrawn?" He answered: "But that time never came."

When the Court of Oyer and Terminer announced that it would receive in evidence the records from New York with respect to the defendant's insanity in 1945, Attorney Levin said (Record page 75a): "All I can tell you at this time that in my opinion we will be offering it for mitigation purposes." (i.e. for mitigation of the sentence to be imposed.)

Judge WELSH asked Judge GUERIN: "The question here was sanity or insanity. How could you determine that question in the way of punishment if it turned out that in your judgment he was insane?" He answered: "If the Court determined that the evidence was sufficient to justify a conclusion that the man was insane at the time of the commission of the alleged crime, the Court would have discretion to declare a mistrial and direct that the plea be withdrawn and the case proceed on the question of insanity first."

Judge SLOANE was asked whether after Dr. Drayton filed his report, the defendant could have made application to change his plea from guilty to not guilty? Judge SLOANE said: "He certainly could have, and I certainly would have agreed to it if he wanted to change his plea."

of the malady is not continuing or permanent, is not enough in itself to require that the question of the prisoner's sanity at the time of a subsequent trial be submitted to the jury trying the case.

In *Com. v. Calhoun*, 238 Pa. 474, 86 A. 472, we said: "It has never been held in our criminal jurisprudence that when insanity is proved to have existed at any indefinite time in the past, it is presumed in law to continue up to the time of the commission of a crime at some subsequent date; much clearer proof of insanity at the time of the commission of the deed is required in order to excuse a homicide: Com. v. Mosler, 4 Pa. 264, 267; Coyle v. Com., 100 Pa. 573, 578; Com. v. Hillman, 189 Pa. 548, 557." See also *Wright v. Jackson*, 59 Wis. 569, 18 N. W. 486.

In *Whitney v. Zerbst, Warden*, 62 F. (2d) 970, the defendant appealed from an order denying a writ of habeas corpus. In his petition the prisoner contends that because he was an "escape" from the custody of the Psychopathic Probation Officer of the county of Los Angeles (California), the removal proceedings were unlawful and the United States District Court for the District of Utah was without jurisdiction to try him on the criminal charge. The Circuit Court of Appeals for the Tenth Circuit, in an opinion by Judge PHILLIPS, said, inter alia: "We cannot subscribe to the doctrine that a person committed for insanity who escapes and commits a criminal act is, because of such commitment, immune from prosecution therefor.

"Where, after an adjudication of insanity and commitment to an asylum in a civil proceeding, a person so adjudged and confined commits a criminal act, a court having jurisdiction over the offense may take him into custody and try him for such offense in the absence of statutory provision to the contrary. Myers v. Halligan (C. C. A. 9), 244 F. 420; In re McWilliams, 254 Mo. 512, 164 S. W. 221.

"While insanity, in the sense that term is used in the criminal law, at the time the criminal act was done may be asserted as a defense to the criminal charge and present insanity may be asserted as a bar to trial on such charge, the issues with respect to such a defense or bar are for the determination of the court having jurisdiction of the criminal offense. In re McWilliams, 254 Mo. 512, 164 S. W. 221. The court may submit the issue of present insanity as a bar to trial to a jury impanelled for that purpose, or may determine the issue itself. . . ."

"While an adjudication of insanity is admissible in evidence upon the trial of an issue of insanity at a time subsequent to such adjudication (State v. McMurry, 61 Kan. 87, 58 P. 961; Wheeler v. State, 34 Ohio St. 394, 32 Am. Rep. 372; Hempton v. State, 111 Wis. 127, 86 N. W. 596), it is not conclusive and may be rebutted by other evidence. Hale v. Harris, 169 Mich. 172, 134 N. W. 1111; Eagle v. Peterson, 136 Ark, 72, 206 S. W. 55, 57, 7 A. L. R. 553.

"The issue of insanity was determined adversely to petitioner at the trial on the criminal charge and any error in such trial proceedings not going to the jurisdiction of the court is not subject to review by habeas corpus. Where one seeks discharge from confinement after conviction for an offense upon a petition for habeas corpus, the sole questions presented are whether petitioner was convicted by a court having jurisdiction of his person and the offense, and whether the sentence pronounced was one within the power of the court. The writ cannot be made a substitute for an appeal. Cardigan v. Biddle, (C. C. A. 8) 10 F. (2d) 444; McIntosh v. White, (C. C. A. 8) 21 F. (2d) 934; Knewel v. Egan, 268 U. S. 442, 45 S. Ct. 522, 69 L. Ed. 1036."

The second basic error of relator's counsel is that if there has been a prior finding of insanity of the prisoner called for trial it is necessary that the question of the

prisoner's sanity at the time of the trial be submitted to the jury trying the case, or at least that there be some formal adjudication of his insanity. This is not the law.

In *Com. v. Cilione*, supra, this Court held that when a trial judge is convinced of a prisoner's sanity when the prisoner is called for trial, the law of Pennsylvania does not make it obligatory upon the judge to order a preliminary inquest.

In *Com. v. Scovern*, 292 Pa. 26, 140 A. 611, this Court said: "Prior to the Act of 1923, the decision as to whether or not the prisoner's sanity should be inquired into rested in the sound discretion of the trial judge. . . . If the judge was compelled, under the Act of 1923, to grant an inquiry in all cases, the act would be used as a subterfuge to escape prompt and speedy trials, as the proceeding could be prolonged with little power in the court to stop or order the inquest returned. The legislature had no intention to thus hamper the administration of its criminal laws."

In *Youtsey v. United States,* (C. C. A. 6, 1899) 97 Fed. 937, 943, it was held that whether or not a preliminary inquiry would be made, lay within the sound discretion of the court.

The third basic error of relator's counsel is that defendant was denied due process of law because the Commonwealth acting through the court did not furnish his attorneys with psychiatrists to testify in his behalf. This Court held in *Com. v. Green*, 346 Pa. 172, 29 A. 2d 491, which was a trial in which the verdict was guilty of murder in the first degree, with penalty fixed at death, that neither the Act of March 22, 1907, nor any other act, authorizes the trial court to appoint a psychiatrist at the expense of the county to serve as an expert witness for the defendant.

The fourth basic error in relator's contention is that this case is "controlled by our decision in Com. v. Siman-

owicz, 242 Pa. 402, 89 A. 562". In its facts that case is distinguishable from this case. When the defendant in that case was called upon to plead to an indictment charging murder his counsel presented a petition alleging him to be insane and unable to confer with counsel and requesting that a preliminary trial be granted to decide the issue of penalty solely. This petition was granted and the jury found the defendant *sane*. Later the defendant by advice of counsel pleaded guilty and the court found him guilty of murder in the first degree and imposed the death penalty. On appeal this Court adjudged that the issue of defendant's sanity had not been properly tried because the jury had been instructed that in order to overcome the presumption of sanity, proof of insanity should be *beyond a reasonable doubt*.

This Court held that the error in the trial of the preliminary issue rendered all subsequent proceedings of which it was a part invalid and was not afterwards cured by the plea of guilty. This Court said: "That plea was entered under a misapprehension by counsel of the facts[12] which induced them to consent to it, and to which it is unnecessary to refer further than to say that neither their good faith nor the wisdom of their action in the light they then had can be questioned."

The jury's finding that the prisoner was sane and the evidence of his guilt of murder being clear (as it was) the defendant's counsel had no alternative but to plead guilty. But when the Supreme Court, because of the erroneous trial instructions, set aside the jury's verdict

---

[12] It also appears from appellant's brief of argument in the case just cited that the District Attorney had said to defendant's counsel that he was willing to accept a plea of murder in the second degree. Counsel for defendant claim that they were told by the trial judge that "under the facts as agreed to by the District Attorney that the case could not rise higher than murder in the second degree". Defendant's counsel then decided to enter a plea of guilty for the defendant.

on the sanity issue, it followed that the plea of guilty entered by counsel for a client who had been *adjudged sane* in a *proceeding later annulled,* had to be also set aside. The issue as to defendant's sanity having been properly raised, that issue had to be determined *in a trial free from substantial error* before a valid plea of guilty could be entered on an acceptance of the jury's finding that the defendant was sane.

Relator's counsel contend that Smith was denied due process of law because certain evidence as to his mental condition was taken *after* the Court had entered a judgment of guilty of murder in the *first degree* against him. The *docket entries* in this case show that judgment of guilty of murder in the first degree was entered on *September 21, 1948,* while the entries on the back of the bill of indictment (which entries are signed by Judges GUERIN, SLOANE and CARROLL) show that the defendant was adjudged guilty of murder in the first degree on February 4, 1949. Whether this judgment was entered on September 21, 1948, or on February 4, 1949, is unimportant in these proceedings. When counsel for the relator entered a plea of guilty to the indictment, that plea admitted the prisoner's sanity because no insane person can be guilty of murder. The testimony relating to Smith's mental condition, taken after the plea had been entered, was for the purpose of providing the court with data which it could use in determining the appropriate penalty to be imposed upon the defendant.[13] See

---

[13] After the Commonwealth's evidence as to the homicide was all in Attorney Berkowitz for the defendant said: "The defendant, prior to the entry of the plea (guilty in this case) understood that the defendant would not put in his evidence at this time." He then referred to "numerous witnesses in New York City and in Brooklyn, especially hospitals where this defendant was confined". Judge CARROLL then asked: "What I am trying to find out is are you going to offer this evidence in mitigation of punishment or as affecting the degree or grade of crime?" Defendant's counsel replied: "All I

*Com. v. Williams,* 307 Pa. 134, 156, 160 A. 602; *Com. v. Dague,* 302 Pa. 13, 152 A. 839; *Com. v. Hough,* 358 Pa. 247, 251, 56 A. 2d 84.

If the evidence taken as to the defendant's mental condition for the purpose of enabling the court to assess. the proper punishment, raised a substantial doubt as to Smith's sanity, it would have been the duty of his counsel to have moved to withdraw the plea of guilty so that a plea of "not guilty because of insanity" could be entered. If the trial court had denied this motion the defendant could have taken an exception and on appeal this Court would have decided whether or not the court in denying the motion had abused its discretion.[14]

The case of *Phyle v. Duffy, Warden,* 334 U. S. 431, is cited by the relator's counsel although, as we will point out, that case supports the position we are taking now. There the defendant was convicted of murder, sentenced to death, and imprisoned pending execution. In compliance with a California statute forbidding the execution of an insane person and prescribing the procedure for obtaining a judicial determination of a prisoner's sanity (to be initiated by the warden if "there is good reason to believe" that he has become insane), the defendant was adjudged insane and taken to a state hos-

can tell you at this time that in my opinion we will be offering it for mitigation purposes." Judge GUERIN then said: ". . . it will be understood that a written statement of the defendant's position will be embodied in the record stating that the purpose of the medical testimony sought to be secured from New York is simply in mitigation of the penalty. . . ." Apparently no such statement *was* "embodied in the record".

[14] 2 Amer. Jur. page 935, Section 141, states: ". . . the action of a trial court in refusing leave to withdraw a plea of guilty is reviewable on appeal or writ of error; and it appears that such action was arbitrary and not the exercise of a sound judicial discretion, the appellate court will not hesitate to reverse." (citing numerous cases) See also 14 Amer. Jur. page 960, section 286.

pital. Thereafter, without notice or hearing, the medical superintendent of the hospital certified that the defendant's reason had been restored; and he was returned to prison and a new date was set for his execution. He petitioned for a writ of habeas corpus in the State Supreme Court but the petition was denied. The United States Supreme Court ruled that "being unable to say that the judgment denying habeas corpus may not rest on an adequate non-federal ground, the writ of certiorari is dismissed". Justice BLACK said: ". . . it would be somewhat anomalous, to say the least, if California courts were wholly without power to correct an executive agent's abuse of authority in a matter of such great significance as the execution of insane persons."

Justice BLACK cited the case of *Nobles v. Georgia,* 168 U. S. 398 as "an authority for the principle that a condemned defendant cannot automatically block execution by suggestions of insanity, and that a state tribunal, particularly a judge, must be left free to exercise a reasonable discretion in determining whether the facts warrant a full inquiry and hearing upon the sanity of a person sentenced to death." Justice BLACK also said: "In considering what the issues may be in a mandamus proceeding, it must be borne in mind that the warden is under a mandatory duty to initiate judicial proceedings, not *when* a defendant is insane, but when *'there is good reason to believe'* he is insane. We cannot say at this time that California's remedy by mandamus will be less than a substantial equivalent of one which authorized him to apply directly to a court for a full hearing. For this Court held in Nobles v. Georgia, [168 U. S. 398] that in the absence of sufficient reasons for holding a full hearing into the sanity of a defendant sentenced to death, a state judge may deny such a hearing consistently with due process. As previously pointed out, the decision in the *Nobles* case emphasized that due process of law

had never necessarily envisioned a full court hearing every time the insanity of a condemned defendant was suggested. Applications for inquiries into sanity made by a defendant sentenced to death, unsupported by facts, and buttressed by no good reasons for believing that the defendant has lost his sanity, cannot, with any appropriate regard for society and for the judicial process, call for the delays in execution incident to full judicial inquiry. And a court can just as satisfactorily determine by mandamus as by direct application whether there are good reasons to have a full-fledged judicial inquiry into a defendant's sanity."

The reason relator's counsel cite the *Phyle* case is because counsel apparently believe that a mandamus does not lie in Pennsylvania to compel the warden or the jail physician to initiate proceedings to determine whether a prisoner is insane. As to this, counsel is in error. Furthermore, counsel have apparently overlooked the fact that regardless of whether or not mandamus would lie under The Mental Health Act this Court possesses the power to prevent the execution of an insane person (as we will hereinafter point out).

Justice BLACK referred to the fact that the California Supreme Court's opinion in the *Phyle* case held that "Petitioner contends, however, that mandamus would not be available under California law if there is another adequate remedy, see Kahn v. Smith, 23 Cal. 2d 12, 142 P. 2d 13, that here habeas corpus is available, and hence mandamus is not. This contention is fully answered by the State Supreme Court's opinion in this case, holding that neither habeas corpus nor any other remedy is available to test sanity of a condemned defendant, except that remedy under §3701 [15] which only the warden can insti-

---

[15] Apparently this is an Act with provisions similar to those of our Mental Health Act, supra.

tute. Hence, so far as it here appears, mandamus to compel action by the warden is the only available remedy. Petitioner contends that this remedy is inadequate because under California law no relief could be hoped for in a mandamus proceeding without a showing that the warden's non-action was arbitrary and capricious. We cannot know, of course, just what precise standards the State Supreme Court may hold must be met by petitioner in order to obtain the judicial inquiry provided in §3701. We are persuaded by the attorney general's statements and brief, and by the state constitution, state statutes, and state decisions to which he referred, that mandamus is probably available, and that in a mandamus proceeding some issues of fact concerning petitioner's sanity can be drawn by the parties, resolved by the courts, and provide support for relief."

It is a principle imbedded in the common law—and we administer the common law in Pennsylvania—that no insane person can be tried, sentenced or executed. See Blackstone's Commentaries, Book Four, Section 24, page 1440.[16] This Court does not accept the view as expressed in the opinions of two Pennsylvania courts of Oyer and Terminer that The Mental Health Act of 1923, as amended in 1937, does not apply to anyone who is imprisoned under sentence of death.[17] Nor do we accept

---

[16] An interesting discussion of this common law principle is found in *Freeman v. People*, 4 Denio, 9 (New York), 47 Am. Dec. 216. The opinion recognizes the rule that the fact of insanity "shall be ascertained as at common law", and that "in the discretion of the court, other modes than that of a trial by jury may be resorted to". (In that case the relator's counsel was William H. Seward.)

[17] In *Commonwealth v. Sullivan*, 86 P. L. J. 205, Judge GARDNER of the Court of Oyer and Terminer of Allegheny County held that the Mental Health Act refers only to those who are imprisoned. He said: "when a person has been convicted and the sentence of death has been passed upon him, and a date for execution has been set

the view of the Commonwealth as expressed in its brief "that relator's remedy with respect to the issue of his present mental condition is by application to the Governor of Pennsylvania".

When a defendant is sentenced to death by electrocution a part of his sentence is that he be imprisoned until his execution. He is therefore a person "detained in prison and undergoing sentence". If in the opinion of the superintendent, jail physician, warden, or of any other official, he is insane any one of these officials should make application to a law judge of the proper court for commitment of the prisoner to a hospital for mental diseases. If the prison officials refuse arbitrarily and capriciously to apply to a judge for commitment of an apparently insane prisoner to such a hospital the prisoner's counsel should apply to the proper court for a writ of mandamus to compel the official to take appropriate action. What this Court held in *Com. v. Hays*, 195 Pa. 270, 45 A. 728, supports our conclusion as to the power of this Court to ascertain whether or not a prisoner who has been adjudged guilty of murder in the first degree is of sound mind. In that case the defendant was convicted of murder in the first degree. A new trial was refused and a petition was filed asking the court to appoint a commission of three citizens to inquire into the sanity of the appellant. This was refused and appeal was taken to the Supreme Court. We said: "If the alleged insanity occurred after the trial, that fact should be conspicuously set forth and supporting testimony of a very convincing character should have been taken. . . . The act

by the governor, he is removed from the jurisdiction of the courts and is solely in the hands of the governor of the commonwealth."

In *Ex parte Briggs*, 14 W. N. C. 341, Judge PEIRCE of the Court of Oyer and Terminer of Philadelphia County held a similar view.

In their brief counsel for the Commonwealth apparently accept the views expressed in these two Court of Oyer and Terminer cases.

of 1874 [18] does not command that upon the mere presentation of a petition the court shall as a matter of right in the prisoner award the commission, but simply provides that it shall be lawful for the court to do so. That means, of course, that *the court shall have the power to do so if a proper case is made out.* Whenever a court refuses such an application the necessary inference is that in the opinion of the court the essential facts have not been established to warrant the granting of the commission. As we have no means of knowing whether there were any such facts, it is impossible for us to say that the court was in error in refusing the petition." (Italics supplied) See also *Com. v. Iacobino,* 319 Pa. 65, 178 A. 823.

In *Com. v. Ragone,* 317 Pa. 113, 176 A. 454, this Court exercised the power it has in cases where a condemned prisoner is insane. The defendant in that case was convicted of murder in the first degree and the jury fixed life imprisonment as the penalty. In that case we said: "As the entire record of the case is now before us, and as we have under the Acts of May 22, 1722 (1 Smith's Laws 140), and of June 16, 1836, P. L. 785, power 'to minister justice to all persons' we can protect the rights of this appellant 'by speedy and summary interposition.' . . . In view of the fact that the order made by the trial judge on April 24, 1934, committing the defendant to the Farview State Hospital for the Criminal Insane was made pursuant to the Act of May 2, 1933, P. L. 224, and that the proceedings under this Act can be had only 'in case of the conviction of any person for any offense,' this order must also be set aside." In that case our judgment was "(1) that the verdict of the jury convicting this appellant of murder in the first degree be set

---

[18] The Act of May 14, 1874, P. L. 160, was an Act very much like our Mental Health Act of July 11, 1923. See *Com. v. Scovern,* 292 Pa. 26.

aside and that a new trial be had when, if ever, this appellant is in mental condition to be legally tried; (2) that the order of April 24, 1934, committing the appellant to the Farview State Hospital be reversed and set aside; and (3) that the order of September 13, 1933, suspending and staying the proceedings under the prison warden's petition to the court to order a due inquiry into the prisoner's mental condition be reversed with a procedendo." See also *Commonwealth v. Jones*, 303 Pa. 551, 154 A. 480.

A prisoner convicted of murder and under sentence of death is (like the relator in the instant case) still in *the hands of the law* and in a proper case the judiciary of the State can intervene by appropriate means to save an insane prisoner from execution. The judiciary has this power both under the statutes and under the common law.

The Supreme Court of Pennsylvania is the highest tribunal of the Commonwealth. Article V, Section 1, of the State Constitution invests with "judicial power" the Supreme Court and certain other courts. If this tribunal should declare itself powerless to save an insane condemned man from execution it would thereby declare itself unwilling to administer the trust imposed on it by the organic law.

In the instant case we find nothing in this record which convinces us that this relator was insane when he committed the murder charged or when he pleaded guilty or at the time he was sentenced to death. The relator has not in any stage of the proceedings been denied due process of law. The petition for writ of habeas corpus is refused.[19]

---

[19] The following additional cases may be cited in support of our decision: *McMahan v. Hunter* (C. C. A. 10, 1945), 150 F. 2d 498, states: "Generally, insanity as a bar to the imposition of sentence is a factual issue for the determination of the court having juris-

The order we made on the 23rd day of November 1949 staying the execution of the defendant until after the rule then granted to show cause why the writ of habeas corpus prayed for should not be granted, is vacated, the effective date of the vacation of that order we fix as January 28, 1950.

---

diction of the offense, and a judgment of sentence by a court of competent jurisdiction may not be collaterally attacked on that issue in a habeas corpus proceedings. (Citing cases) . . ."

In *Ex Parte Potts*, 205 P. 2d 522 (1949), the Criminal Court of Appeals of Oklahoma held that habeas corpus cannot be invoked for release of one imprisoned under judgment and commitment by a court of competent jurisdiction unless judgment and sentence are clearly void; that where a prisoner in custody under sentence of conviction seeks discharge on habeas corpus, inquiry is limited to questions whether court in which prisoner was convicted had jurisdiction of person of defendant and of crime charged, and whether court had jurisdiction to render particular judgment; that writ of habeas corpus may not be used as a substitute for an appeal; and that the question of defendant's insanity at time of commission of offense or at time of trial cannot be raised on habeas corpus after judgment of conviction has become final.

The Supreme Court of the United States has ruled in accordance with the foregoing pronouncements in, inter alia, the following cases: *Andrews v. Swartz*, 156 U. S. 272, 15 S. Ct. 389; *Felts v. Murphy, Warden*, 201 U. S. 123, 26 S. Ct. 366; *Frank v. Mangum*, 237 U. S. 309, 35 S. Ct. 582; *House v. Mayo*, 324 U. S. 42, 46, 65 S. Ct. 517; *Walcy v. Johnston*, 316 U. S. 101.